RILEY-WILSON GROCER COMPANY, Appellant, v. SEYMOUR CANNING COMPANY, Respondent.

**St. Louis Court of Appeals, March 3, 1908.**

1. **CONTRACTS: Interpretation: Intention of Both Parties.** A canning company agreed to sell to a wholesale grocer company a certain number of cans of tomatoes of a certain season, with the proviso that the seller should "not be held liable for fulfillment of the contract in the event of total failure or destruction of crop." In an action by the wholesale dealer against the canning company for failure to deliver the tomatoes according to contract, the defendant pleaded a total failure of crop in the vicinity of the cannery during the season covered by the contract. *Held,* an instruction telling the jury that a total failure of crop meant failure in the territory in which the defendants expected to secure their supply of tomatoes, was error because the contract must be interpreted according to the intention of both parties and not merely the intention of one party.

2. ———: ———: **Patent Ambiguity: Extraneous Evidence.** The exception in said contract is ambiguous, but not in a sense that it must fail; the old rule that proof will be received to aid a latent but not a patent ambiguity has been changed so that now evidence of extraneous facts is admitted to explain the meaning of contracts patently ambiguous in a measure such as the above.

3. ———: ———: ———: **Failure of Crop.** The exception set out could not necessarily be interpreted to mean that the crop failure which would excuse the defendants was a universal failure or one co-extensive with the United States, nor was the fact that two per cent of the average crop was raised in the vicinity of the cannery sufficient to compel a finding that the crop did not fail.

4. ———: ———: **Question of Fact.** Though the interpretation of a written instrument is usually for the court, yet if what the parties to the agreement meant depends upon extraneous facts which are in dispute or which would support different inferences, the question of intention may be for the jury, as where

there may be some usage of business by which the contract is to be interpreted or special circumstances which would assist in elucidating its meaning. If such facts should be shown admitting of different inferences as to the intention of the parties, it would be a question for the jury as to whether there was a total failure of the tomato crop during the season mentioned in the exception to the contract as above set out.

Appeal from Webster Circuit Court.—*Hon. Argus Cox,* Judge.

REVERSED AND REMANDED.

*G. M. Sebree, Sam M. Wear* and *George Pepperdine* for appellant.

(1) The court cannot read into a contract already plain an additional article of agreement, not contemplated by the parties, and then by an instruction allow a party to escape a liability where no such escape was provided for in the original agreement. Johnson v. Pugh, 85 N. W. 641, 110 Wis. 487; Walker v. Automobile Co., 124 Mo. App. 628. (2) The defendants under the law were compelled to go into the markets of the world if necessary to comply with their agreement. And to avoid liability they must show that they could not have met the terms of the contract by doing so. Newell v. Canning Co., 97 N. W. 487.

*M. Selph* and *Perry T. Allen* for respondent.

The fact that there was not an absolute extinction of everything resembling a tomato, did not prevent the crop from being a total failure, or being "totally destroyed," within the meaning of the contract. O'Keefe v. Insurance Co., 140 Mo. 558.

GOODE, J.—On May 29, 1905, plaintiff, an incorporated company, entered into a contract with the defendants a partnership composed of thirty or forty members, for the purchase of fifteen hundred cases of tomatoes. The contract was in writing and reads as follows:

"Seymour, Mo., May 29, 1905.

"Sold Ryley-Wilson Grocer Company, Kansas City, Mo., for the account of Seymour Canning Co., Seymour, Mo., 1500 cases Standard 3-lb. tomatoes, 1905 pack, 70 cents per doz. f. o. b. the factory. 12-1.2 ct. to Kansas City, Mo., or at 10 cts. to Pittsburg, Kas.

"Terms cash, less 1-1.2 per cent in ten days.

"75 per cent delivery guaranteed. 6 months guarantee against swells from date of invoice.

"Shipment when packed.

"Seller shall not be held liable for fulfillment of this contract in the event of total failure or destruction of crop, or destruction of cannery by the elements.

"SEYMOUR CANNING COMPANY, Seller,

"Accepted A. H. DAVIS.

"RYLEY-WILSON GROCER CO., Buyer,

"Accepted H. I. WILSON."

On June 17, 1905, the parties entered into two other contracts in writing, by the first of which plaintiff purchased and defendant sold one thousand cases of tomatoes, and by the other contract plaintiff purchased and defendants sold five hundred cases of tomatoes. The two contracts of June 17th are similar to the one of May 29th, save the exception to the liability of the defendants for non-performance contained in the last two contracts, which reads as follows:

"Seller not liable for delivery of goods in case of destruction of cannery, and not liable for delivery of more than 75 per cent of this order in case of inability to fill order in full, owing to partial or complete destruction of crops by hail, drought or any unavoidable accident or casualty."

This action was instituted in three counts for damages for the non-performance by defendants of the three agreements. In the first count plaintiff demands damages in the sum of $1,275, in the second of $850, and in the third of $425. It will be observed that three

thousand cases of tomatoes were sold in all, fifteen hundred under the contract of May 29th and fifteen hundred under the two contracts of June 17th.    The defense set up in the answer was based on the exceptions to defendants' obligation to perform embodied in the respective contracts.    It is alleged in the answer that the crop in the vicinity of the cannery of the defendants was a total failure during the season of 1905, because of extremely wet weather and other unavoidable conditions of the elements; that these conditions resulted in the destruction of the tomato crop in the vicinity and, therefore, defendants were unable to perform the contracts and were, by the terms thereof, released from performance.    The reply was a general denial.    It was proved the time for deliveries ran from August to December, according to the usual course of business, but sometime in September plaintiff wrote defendants asking for shipments of tomatoes, and on September 15th defendants wrote the following letter:.

"Seymour, Mo., Sept. 15, 1905.
"Meinrath Brokerage Co., Kansas City, Mo.

"Gentlemen:  We beg to say in relation to your letter of the 14th inst. that our tomato crop was a complete failure; our factory packed less than two cars of tomatoes.    You can say to your customers that they may expect nothing from the Seymour Canning Company as the tomatoes did not grow this year.

"Very respectfully,

"SEYMOUR CANNING CO."

Several letters from the plaintiff were introduced, which show plaintiff stood on the letter of the contracts, and insisted on delivery under each contract to the amount of seventy-five per cent of the cases agreed to be furnished.    No tomatoes were delivered.    It was proved that, as alleged in the answer, the tomato crop in the vicinity of Seymour, in Webster county, where the cannery of defendants is, was a failure during the

season of 1905, on account of unfavorable crop conditions, principally the excessive rainfall.    After these contracts were entered into, the defendants made contracts for the raising of tomatoes with farmers in the vicinity, mostly members of the defendant firm.    These contracts called in the aggregate, for two hundred and fifty acres to be planted in tomatoes, and according to the yield of an average season, there would have been grown and gathered on this acreage thirty-five thousand cases of tomatoes, or more.    So unfavorable was the season that only about eight hundred cases were gathered on the entire acreage, and the evidence goes to show that on from two-thirds to one-half of it not a tomato was ripened or gathered.    A little over two per cent of an average crop was raised.    But, as said, defendants' cannery put up about eight hundred cases and these were tendered to plaintiff in partial discharge of defendants' obligation under the two contracts of June 17th.    These contracts called for fifteen hundred cases, but defendants were only bound to deliver seventy-five per cent of that quantity in case of a total or partial failure of the crop.    Hence they were only bound to deliver eleven hundred and twenty-five cases.    They offered to pay plaintiff's loss on the remaining three hundred and twenty-five cases if the eight hundred cases, which contained the entire tomato crop of the vicinity, were accepted; but plaintiff refused to accept them.    It seems to have been part of the tender by defendants they should be released from liability under the first contract of May 29th.    It will be observed said contract provided defendants should not be bound for its fulfillment in the event of a total failure or destruction of the crop by the elements; whereas the other two contracts bound defendants to deliver seventy-five per cent of the stipulated quantity, even if there was "a partial or complete destruction of the crop by hail, drought, or any unavoidable accident or casualty."    Because of the different

stipulations of the contracts regarding the liability of the defendants in the event of a crop failure, defendants claimed they were not bound to deliver any tomatoes under the first contract as there was a total failure of the crop; but admitted they were bound to deliver seventy-five per cent of the quantities stipulated in the other two contracts. The court instructed the jury to return a verdict for defendants on the second and third counts of the petition, or, on the two contracts of June 17th, which was done, and the propriety of the recovery on these two counts is not in question on the appeal.

Regarding the liability of the defendants on the first count, that is, on the contract of May 29th, the jury were instructed to return a verdict for plaintiff unless they believed from the evidence there was a total failure or destruction of the tomato crop, and that by a total failure of the crop as used in the contract described in the first count of the petition, was meant either that no tomatoes at all were produced *in the territory from which the defendants expected to secure their supply of tomatoes* (italics ours) or that if any were produced the amount was so small as only to amount to a trifle, and be of no consequence as compared with what would ordinarily be produced in such territory. The burden of proving a total failure of the crop by a preponderance of the evidence was imposed on defendants. Plaintiff's counsel requested the court to instruct that in determining whether or not there was a total failure of the crop, the jury should "take into consideration the number of tomatoes packed by defendants and the number of cases contracted by them to plaintiff," and if the jury believed there was packed by defendants a substantial amount of tomatoes, with reference to the amount called for in said contract, it should find there was not a total failure of the crop within the meaning of said contract, and the verdict should be for the plaintiff on the first count. Said

charge was refused. The court also refused to instruct that if, during the season of 1905, there were produced in the vicinity of defendants' cannery eight hundred or more cases of tomatoes, then, as a matter of law, there was not a total failure of the crop. The jury having found a verdict for defendants on the first count of the petition, error is assigned in giving and refusing the instructions we have quoted.

The instruction given for defendants errs in confining the meaning of the expression "total failure or destruction of crop" as used in the contract of May 29th, to the crop in the vicinity of the cannery from which defendants expected to secure their supply of tomatoes. This limitation took no account of what plaintiff understood the expression to mean. Where a party by his own contract puts an obligation on himself without qualification or exception, he is held liable for non-performance, though performance becomes impossible. [Whittemore v. Sills, 76 Mo. App. 248.] These parties introduced an exception in case of a failure of the tomato crop over a territory left undefined. For this exception to come into play and excuse defendants from delivering the tomatoes as agreed, it was essential for the crop to fail over the territory intended by both parties; not merely the territory from which defendants expected to get their supply. This is no more than saying the contract means what both parties intended it to mean, taking into view the entire situation and all facts existing when it was made—what it should in fairness and reason have been intended to mean. The defendants entered into contracts with some seventy-five growers to raise tomatoes for their cannery, and probably expected to get their supply from the territory planted by these growers; say two hundred and fifty acres. But it by no means follows plaintiff understood defendants were not bound to furnish the tomatoes if the crops planted by those growers failed. The obliga-

tion of no contract can be confined within the limits of what one party understood it to mean, unless it is shown such limits coincide with what must be assumed to have been the intention of the other party, taking into consideration the expressions used and the attendant circumstances. [2 Parsons, Contracts (9 Ed.), *496, bottom p. 650; Tiedeman, Contracts (5 Ed.), p. 2; Foley v. Pettis, 5 Mo. App. 262; Hax v. Hax, 84 Mo. App. 306; and see cases cited in opinion in Embry v. Hargadine etc. Co., 105 S. W. 777, 127 Mo. App. 287.] This inquiry occurs in this case: Over what territory did both parties understand the crop must fail in order to excuse defendants from delivering the tomatoes as agreed? From reading the agreement it is obvious the answer to this question is uncertain; that is to say, there is nothing in the wording of the instrument which defines the territory meant. And perhaps the uncertainty appears on the face of the contract and is patent. Yet we do not think it is patent in the sense that it must cause the contract to fail or the exception to be disallowed. The old learning that proof will be received to help a latent but not a patent ambiguity, has been changed in modern times, and the rule is now applied so as to let in evidence of extraneous facts in aid of the meaning of contracts which sometimes are patently ambiguous in a measure. [2 Parsons, Contracts, *pp. 561, et seq., bottom page 713 et seq.] This is done in order to support agreements which would otherwise fail for obscurity, and the courts will go as far as they can in receiving evidence *aliunde*. The limitation is this: they will not substitute a contract for the one the parties made. Parsons says in this connection:

"In other words, if the contract which the parties have made is incurably uncertain, the law will not or rather cannot enforce it; and will not, on the pretence of enforcing it, set up a different but valid one in its stead. It will only declare such a supposed contract

no contract at all; and will leave the parties to the mutual rights and obligations which may then exist between them.     But, on the other hand, the law will not pronounce a contract incurably uncertain, and therefore null, until it has cast upon it all the light to be gathered, either from a collation of all the words used, or from all contemporaneous facts which extrinsic testimony establishes.     If these make the intention and meaning of the parties certain, it may still be an intention which the words cannot be made to express by any fair rendering.     In this case also the contract is null, for it is the words and not the intention without the words that must prevail.     But if, when the intention is thus ascertained, it is found that the words will fairly bear a construction which makes them express this intention, then the words will be so construed, and the contract, in this sense or with this interpretation, will be enforced, as the contract which the parties have made.

"The distinction and the rules of Lord BACON are therefore less regarded of late, than they were formerly. They are intended to enable the court to distinguish between cases of curable and those of incurable uncertainty; to carry the aid of evidence as far as it can go without making for the parties what they did not make for themselves, and to stop there."     [2 Parsons (9 Ed.), *561.]

As very instructive in this connection, we quote from the opinion by the Master of the Rolls in Colpoys v. Colpoys, Jacobs, 451, 463:

"In the case of a patent ambiguity, that is one appearing on the face of the instrument, as a general rule a reference to matter dehors the instrument is forbidden. It must, if possible, be removed by construction, and not by averment.     But in many cases this is impracticable; where the terms used are wholly indefinite and equivocal, and carry on the face of them no certain or explicit meaning, and the instrument furnishes no ma-

terials by which the ambiguity thus arising can be removed; if in such cases the court were to reject the only mode by which the meaning could be ascertained, viz. the resort to extrinsic circumstances, the instrument must become inoperative and void.    As a minor evil, therefore, common sense, and the law of England (which are seldom at variance) warrant the departure from the general rule, and call in the light of extrinsic evidence.    The books are full of instances sanctioned by the highest authorities both in law and equity.  When the person or the thing is designated on the face of the instrument, by terms imperfect and equivocal, admitting either of no meaning at all by themselves, or of a variety of different meanings, referring tacitly or expressly for the ascertainment and completion of the meaning to extrinsic circumstances, it has never been considered an objection to the reception of the evidence of those circumstances, that the ambiguity was patent, manifested on the face of the instrument.  When a legacy is given to a man by his surname, and the Christian name is not mentioned; is not that a patent ambiguity? Yet, it is decided, that evidence is admissible.    (a) So where there is a gift of the testator's stock, that is ambiguous, it has different meanings when used by a farmer and a merchant.    So with a bequest of jewels: if by a nobleman, it would pass all; but if by a jeweler, it would not pass those that he had in his shop.  Thus the same expression may vary in meaning according to the circumstances of the testator."

Having concluded the exception is to be enforced, the next inquiry is as to its meaning—what did the parties intend?  It is contended for plaintiff the crop failure must have been general, or, at any rate, so extensive that defendants could have bought no tomatoes in the markets of the country to pack and deliver in execution of their contracts.  This contention appears to us to be extravagant; for it is highly improbable the

Grocer Co. v. Canning Co.

parties contemplated such enterprise by the defendants. We are pointed to the decision in Newell v. New Holstein, etc., Co., 119 Wis. 635, as supporting plaintiff's theory of the contract. But the contract passed on by the Wisconsin court was unlike the one before us. It said nothing in words about a crop failure, but contained an exception reading as follows: "If by the destruction of the cannery by fire, or if on account of strikes, or from any other cause over which the seller has no control, he is prevented from performing this contract, he shall not be liable for any damages for such failure." It was shown the crop failed in the vicinity of the Wisconsin cannery and over the eastern part of the State of Wisconsin, but this fact was held not to exonerate the defendant from performance. The court said that in view of the facts and circumstances under which the agreement was made, the natural conclusion was the parties did not intend or understand the defendant undertook to sell and deliver tomatoes to be grown in the immediate neighborhood; for it was left the right to go into the open markets and buy, pack and deliver them to the plaintiff under the terms of the contract, and was bound to make all reasonable efforts to secure the amount in that way. The exception in the contract in hand purports to release defendants from liability in the event of a total failure of the crop. It is likely the parties had in mind a crop failure over some definite area, or in a certain region of the country; not a universal failure which would prevent the defendants from finding tomatoes for sale in any market of the world, or even the markets of the United States. We are reasoning about but not deciding this question, because the exception is expressed in ambiguous terms and facts which would elucidate its meaning were not put in proof. Moreover, as we shall point out below, the solution is likely for the triers of the fact. What we decide is that the court erred in instructing regarding

the meaning of total failure or destruction of the crop, and confining the failure to the territory from which defendants expected to get their supply.    We do not hold error occurred in refusing the instructions requested by plaintiff, some of which were covered by those given.    Plaintiff was not entitled to a peremptory instruction for a verdict in its favor, because the evidence tended to show a total crop failure, not only in the fields planted by the growers with whom defendants made contracts, but in the entire vicinity of Seymour. The instruction asked by plaintiff which advised the jury they should determine whether there was a crop failure, by taking into consideration the number of tomatoes packed by defendants, and if they found there was a substantial quantity packed, should find there was not a total failure of the crop within the meaning of the contract, was an unwarranted argument on the evidence, and set up a false criterion of what was meant by a failure of the crop.    The fact that eight hundred cases of tomatoes were grown where thirty-five thousand cases were usually grown, would not, of itself, compel a finding that the crop did not fail; but the jury might well have found that if only two per cent of an average crop was raised, the crop had totally failed   within the meaning of the parties.

It strikes us the extent of the failure, territorially speaking, which would constitute a total failure in the sense of the contract and the intention of the parties, is left so uncertain that probably it must be determined by a jury from all the circumstances throwing light on the question which may be put in evidence.    Though the interpretation of written instruments is, in most instances, for the court, this is not universally true.    If what the parties to an agreement meant, depends on extraneous facts which are in dispute, or which would support different inferences, the question of intention may be referred to the triers of the fact.    Some facts

are before us which point to the conclusion that plaintiff did not understand the crop failure must be so widespread as to render tomatoes unpurchasable in any market of the country.    The two contracts of June 17th, though they bound defendants to deliver seventy-five per cent of the stipulated quantity in case of a total or partial failure of the crop, contain an exception as to the remaining twenty-five per cent if the failure was due to the destruction of the crop by "hail, drought or any unavoidable accident or casualty."    Now the use of the word "unavoidable" in those agreements, suggest that the crop failure which was to excuse performance was one the defendants could not avoid; thereby implying there might be a failure of crops for which they would be to blame and which would not excuse performance.    But this could not be true unless the failure was confined to territory over which they might have some control; that is, the vicinity of the cannery or the territory planted by persons with whom they made contracts and with whom they might have stipulated against inefficient cultivation of the crop.    Then if a universal failure was meant, why bind defendants to deliver seventy-five per cent of the quantity stipulated? How could defendants do this if there was a general failure?    It is true the contracts of June 17th are no part of the contract of May 29th; but as the three were made about the same time and between the same parties, the exception to defendants' obligation to perform allowed in the last two contracts, may be treated as a fact or circumstance to aid in the interpretation of the first one.    Again, there may be some usage of business by which such agreements are to be interpreted; or special circumstances in this particular case which would assist in elucidating the meaning of the exception.    A vague exception like the one in question, inserted in the contract of a small cannery in a rural

neighborhood, far removed from general markets, might receive a different interpretation from one made with an extensive establishment in a great city, which was known to gather its tomatoes for canning from over the whole country and perhaps from foreign markets. The distance tomatoes will bear shipping to be canned might be a circumstance for consideration. The intention of parties to agreements is usually founded on the general course of affairs, and this is especially true in commercial contracts, which are often written in abbreviated forms and are to be interpreted by reference to usage. [Kauffman v. Raeder, 108 Fed. 171.] We glean from the record that these defendants are merely a group of farmers who have established a tomato cannery in a small town, and it is not unreasonable to believe both parties to the agreements knew defendants depended on tomatoes grown in the neighborhood for the fulfilment of their undertaking and inserted the exception to the duty to deliver in view of such facts. The record is barren of most of the circumstances which would elucidate the meaning of the expression used. Unless proof should be made at another trial of undisputed facts—facts not admitting of different inferences as to the intention of the parties—it will be for the jury to say whether there was a total failure of the tomato crop during the season of 1905, over the territory which the parties meant should be embraced within the scope of their agreement. A case in which it was left to the jury to determine what parties meant by a term in a contract, was Durand v. Henny, 33 Wash. 38. The writing construed in said case, was one by which a party named Severance was given the exclusive right to haul freight for the Red Line Transportation Company from White Pass, Alaska, to Atlin City. The contract also provided that in case freight to Altin fell off, the Red Line Company would give Severance the preference over others in hauling freight controlled by said com-

pany to Bennett and other points. The question was what did the parties mean by this stipulation. It appeared *aliunde* the Government of Canada was considering the question of prohibiting aliens from obtaining title to placer mines about Atlin City, which action would be apt to reduce the quantity of freight to be hauled to said point; and the court said probably the parties intended by the stipulation for a preference in favor of Severance in the hauling of freight to other points, that in case the freight to Atlin fell off in consequence of such legislation, he should have a preference. But the court said whether this was true or not, there were such elements of uncertainty as to the intention of the parties, as to make their intention a question for the jury. The opinion cited, as in point, Carstens v. Earles, 26 Wash. 676. See, too, Wooster v. Butler, 13 Conn. 309; Dentman v. Kilpatrick, 46 Mo. App. 624, 627; Blanke v. Dunnerman, 67 Mo. App. 591; Granite Co. v. Milling Co., 78 Mo. App. 622, 628; 2 Paige, Contracts, sec. 1107. In Wilcox v. Baer, 85 Mo. App. 587, the question was what was meant by the phrase "traveling expenses," in the contract employing a commercial traveler. It was held that as the meaning depended on evidence regarding the sense of the phrase in commercial circles, the question was for the jury and not for the court. What territory the parties meant to be embraced in a total failure or destruction of the tomato crop, depends altogether on the sense of the exception in trade usage, if it has a sense thus affixed to it, or if not, on extrinsic facts. In either event the meaning is too indefinite for this court to pronounce concerning it on the words used or the evidence contained in the present record.

The judgment is reversed and the cause remanded. All concur.