# FRANK JOHN MARTIN v. ELIZABETH MARTIN et al.; KATHRYNA SCHENK, Appellant.

### Division One, May 31, 1913.

1. **PARTITION: Equitable: Practice.** Equitable interests in land may be partitioned. While such proceeding is called an equitable one in distinction from the action at law prescribed by the statute, the practice is regulated by the statutory provisions so far as applicable.

2. ————: ————: **Establishing Equitable Title: Parol Evidence.** Where it is sought, in a suit in equity for partition of lands, to establish a trust or other equitable title by parol evidence, the proof must be clear and convincing. Consideration is the foundation of such interests.

3. ————: ————: ————: ————: **Contract Legitimating Child.** Parol evidence set out in the opinion *held* sufficient to establish the making of a contract by a husband with his wife to make her child, born ten months before the marriage, his own.

Appeal from Cooper Circuit Court.—*Hon. W. H. Martin*, Judge.

AFFIRMED AND REMANDED.

*W. V. Draffen, Williams & Williams*, and *Jeffries & Corum* for appellant.

The court erred in finding the issues for the plaintiff. The plaintiff offered no evidence tending to sustain the contract pleaded or warranting the decree rendered. Walker v. Bohanan, 243 Mo. 119; Forrester v. Sullivan, 231 Mo. 373; Grantham v. Gossett, 182 Mo. 671; Asbury v. Hicklin, 181 Mo. 672; McElvain v. McElvain, 171 Mo. 257; Kinney v. Murray, 170 Mo. 700; Steele v. Steele, 161 Mo. 573.

*John Cosgrove* and *Daniel W. Cosgrove* for respondent.

The evidence in this case clearly establishes the fact that John Martin, Jr., considered that he had adopted the plaintiff and brings the case clearly within the principle announced in: Lynn v. Hockady, 162 Mo. 111; McElvain v. McElvain, 171 Mo. 254; Healy v. Simpson, 113 Mo. 347.

BROWN, C.—This is a suit for partition of land instituted March 25, 1909, by filing the following petition:

"Frank John Martin, Plaintiff,

      v.

"Elizabeth Martin, Defendant.

"Plaintiff states that John Martin, Jr., died in the county of Cooper, State of Missouri, on or about the 25th day of October, 1908, seized of the north half of the southeast quarter of section twenty-one and the northwest quarter of the southwest quarter of section twenty-two, all in township forty-eight, range eighteen,

situated in said county of Cooper and State of Missouri.

"Plaintiff further states that John Martin, Jr., was the husband of the defendant, Elizabeth Martin; that said John Martin, Jr., was married to the defendant in Cooper county, Missouri, May 1, 1865; that the plaintiff is the son of the defendant; he was born June 14, 1864; that before the said John Martin, Jr., and defendant were married said John Martin, Jr., promised and agreed that if the defendant would marry him he would adopt her said child and would make him his heir, and in all manner and respect consider him and keep him as his lawful son, and if any child or children were born of said marriage that plaintiff should share with said child or children thereafter to be born the same as if plaintiff were the natural son of John Martin, Jr.; that after the marriage of the said John Martin, Jr., and the defendant, plaintiff's name was changed from John Gillett to Frank John Martin, and the said John Martin, Jr., during his lifetime treated plaintiff as his child, introduced him and spoke to others of him as his son, and in all ways treated him as such; that plaintiff was led to believe by the said John Martin, Jr., and did believe that he was a natural son of the said John Martin, Jr., and did not know the contrary until he had grown to manhood; that said John Martin, Jr., called the plaintiff "son" and plaintiff called him "father;" that plaintiff lived with the said John Martin, Jr., in his home until he was over forty years of age, worked on the farm and helped accumulate and pay for whatever estate the said John Martin, Jr., had at the time of his death; that said John Martin, Jr., had no other child or children and left surviving only the plaintiff and defendant; that no other persons have interest in said land, and plaintiff says that as the adopted child of the said John Martin, Jr., he is entitled to share in said real estate in all respects as if he were the natural son

of the said John Martin, Jr., deceased. Plaintiff says that he is entitled to an undivided one-half of said real estate and the defendant is entitled to the other undivided one-half thereof in fee simple; that the debts of the said John Martin, Jr.'s estate have been paid and no part of said real estate will be required to pay the debts of the said estate.

"Plaintiff further states that said land can be divided in kind between himself and the defendant.

"Plaintiff therefore prays that partition be made of said land according to the respective rights of the parties, and that if it be found that partition cannot be made in kind that said land be sold and the proceeds appropriated according to the respective rights of the parties hereto, and for such other and further relief as to the court shall seem meet and just."

Mrs. Schenk was afterward, on her own petition, made a defendant, and filed answer stating' that she was the only sister of John Martin, Jr., and his sole heir other than Elizabeth Martin the original defendant; so that the suit became a contest solely between her and the plaintiff.

The appellant, in her brief, admits that John Martin, Jr., died October 25, 1908, the owner of the land described in the petition, that the defendant Elizabeth Martin is the widow, and the defendant Kathryna Schenk his sister, and that the plaintiff is the illegitimate son of the defendant Elizabeth Martin and was born June 14, 1864, and that his mother was married to John Martin, Jr., on May 1, 1865; so that plaintiff was then about ten and a half months old. It is not questioned that the plaintiff lived with his mother and her husband, working on the farm, until he was forty-two years old, when he married and settled near them. He was always known by the name of Martin, and John Martin, Jr., treated him as and called him his son and the evidence shows that he talked freely with the neighbors about his position in the family. Mr.

Mann, one of the old neighbors, said that he had heard him talk about it maybe a hundred times—about Frank being his son and that he wanted him to have everything he had; that he married Mrs. Martin with the understanding that he would adopt him and take him as his son. The last talk this witness had with Mr. Martin was only three or four years before the trial. He asked Mr. Martin if he had made any provision for Frank, and he said he did not feel it was necessary, that Frank was his child, and he considered him his son. He said that he had promised the priest that he would treat Frank as his own son.

Mrs. Fisher, Mr. Martin's sister-in-law, who had lived with them eleven or twelve months when Frank was about three years old, said that Mr. Martin called him his own son and that hardly anybody knew to the contrary, that he often caressed him and showed affection for him. The witness left the neighborhood when Frank was eight or nine years old, staying away about eight years, then returned, and remained in the neighborhood ten or twelve years, during which she visited the Martins, staying perhaps a whole week at a time. Frank was always introduced as Mr. Martin's son—a child of the house. Many times he would take him up and caress him and say he was his own child.

Mr. Gerhardt, another neighbor, said that after Frank was twenty-one years old he heard that he was not Mr. Martin's own son and asked the latter about it, and was told that he took him as his son and that whenever he died all that he owned was his. He said "whatever we got is Frank's after my death."

Mr. Roe lived in the neighborhood and knew the Martins. He had heard Mr. Martin speak frequently of Frank as his son, and heard him say that when Frank was a young man growing up, boylike he liked to have some times as well as other boys, and thought he was pretty closely confined at work sometimes. He

said that Frank thought he had a pretty hard time but "it's all for Frank anyhow; Frank gets it all when we are done with it, and I think I will let him do some of the work." Frank remained continually on the farm and worked until he married, and the witness lived on adjoining farms the most of the time for thirty-five years and was intimate with them and saw Mr. Martin at his home the day he died.

Barney Martin, a cousin of Mr. Martin, testified that Mr. Martin said that Frank was his son, and that he claimed him as such all the time.

The defendant introduced no evidence. The court found for plaintiff and determined that as heir of John Martin, Jr., he was entitled to share in the distribution of the estate as a child and that the defendant Kathryna Schenk had no interest in the land or any part thereof, and adjudged that the dower and homestead be set off to the defendant Mrs. Martin; that the remainder of the land be vested in the plaintiff; and appointed commissioners to make partition accordingly. This appeal is taken by Mrs. Schenk from the interlocutory judgment.

The defendant Mrs. Martin testified, but her testimony was afterwards excluded by the court on the ground that she was incompetent as a witness. In the light in which we view the testimony her statements were simply cumulative and neither added to nor detracted from its weight.

It has been necessary in the foregoing statement to set forth the petition *in haec verba* because the difficulties of the case depend upon its form and effect. Had it been drawn with reference to the facts in evidence these would have been eliminated. It appears with great distinctness, however, that the object of the proceeding is *partition*. The petition states that the plaintiff is entitled to an undivided one-half of the land and his mother to the other undivided one-half in fee simple. Had the plaintiff seen fit to rest

his title upon this averment alone the proceeding would have been a simple statutory suit for partition in which the legal title alone would have been involved; and we would be called upon to decide whether or not the plaintiff, under the provisions of section 341 of the Revised Statutes of 1909, was a legitimate child. For, as was said by Judge VALLIANT for this court in Gates v. Seibert, 157 Mo. 254, 272, " a legitimate child under our law is one born in lawful wedlock, or of a widow within ten months after the death of her husband, or born before the marriage of its parents who afterwards marry, and receives the recognition of its father; and one such child is just as legitimate before the law as the other. The statute has made them equal before the law and the courts cannot make them unequal." But the plaintiff, in view, no doubt, of facts not otherwise disclosed in the record, saw fit to ignore in the petition the illegitimacy of the plaintiff and to place his rights in this case squarely upon equities arising out of an alleged contract of Mr. Martin with his mother. The case was tried and the finding of the court made upon that theory, and we will consider it from the same point of view.

That equitable interests in land may be partitioned in an appropriate proceeding for that purpose has been long settled in this State. While such a proceeding is called an equitable one in distinction from the action at law prescribed by the statute in such cases, it is also settled that the practice will be regulated by the statutory provisions so far as applicable. [Donaldson v. Allen, 213 Mo. 293, and cases cited at pp. 299, 301.] It is equally true that where it is sought in such cases to establish a trust or other equitable title by parol evidence, the proof must be clear and convincing; in fact it must leave no reason-

Equitable Partition: Practice.

250 Mo.—35

**Parol Evidence.** able doubt in the mind of the chancellor as to the existence of the facts upon which the equity depends. The consideration is the foundation of such interests, and where equity intervenes to remove the inhibition of the Statute of Frauds, it is usually upon the ground that one who has received the consideration of the transaction is guilty of a fraud if, keeping it, he refuses to render the thing for which it was paid. When he thus imposes upon the confidence of the victim until he surrenders the consideration before receiving the thing he buys, equity will not permit the statute enacted to make the evidence of the transaction clearer and more reliable, to be used as the controlling instrument of concealment and fraud. But in granting this relief it requires a case to be made with the same force and certainty that the statute was designed to insure. In doing this the consideration is the foundation upon which the evidential structure is built.

Here we have the fact that a woman is alleged to have made the agreement in question to give a name and home to her illegitimate child. This circumstance is not inconsistent with moral rectitude **Contract to Legitimize a Child.** and innocence. She may have been induced by deception or ignorance into a void matrimonial relation, or the misfortune she was attempting to mitigate may have come to her and the child in any one of the many ways that we can imagine, without moral fault on her part. As was said by the Supreme Court of New York in Townsend v. Van Buskirk, 68 N. Y. Supp. 512, "we must not lose sight of the fact that she is entitled to the full benefit of the presumption of innocence of any wrongdoing, moral or otherwise, until the contrary is shown by a fair preponderance of evidence." It is only when one enters upon a cohabitation known to be meretricious that the presumption of innocence fails. [1 Bish. Mar. & Div., sec. 961.] In this case there is no pre-

tence that there was anything meretricious in the cohabitation which resulted in the birth of the plaintiff, and the position of the mother has been treated with most perfect consideration in the trial and presentation of the case. When her child was ten months old she formed a matrimonial relation with Mr. Martin in which they lived in apparent happiness for forty-three years, during which the plaintiff was a member of the family, and engaged in the common work. It is said that there is no more meritorious consideration upon which to found an undertaking or conveyance than marriage. In this case the sacred duty rested upon the mother to give her offspring a name and to preserve it from the stigma of bastardy. The man who would willingly take the mother into his own life without assisting her in this would be inconceivable; so that we have united the most meritorious of considerations, the strongest of the human instincts, and the spontaneous impulse of a healthy manhood as the foundation for the agreement and evidence of its probability.

As we would naturally expect under such circumstances, Mr. Martin having assumed the position of father to the child made no secret of the new relation. He delighted in talking about it. Conversations of which he made it a subject were related or referred to in evidence covering the entire forty years during which the family was together. He freely spoke of the promise to the mother. Among the remarks attributed to him in the testimony, were the statements that he wanted Frank to be his own son; that he married the mother with the understanding that he would adopt him and take him as his son; that Frank was his child and he considered him his son; that he took her child for his own; that he took him as his son and that all that he (the father) owned was his when he died; it is all for Frank; he gets it anyhow when we are done with it; that Frank would get all he had when

he died; and other expressions of which those mentioned constitute fair samples. No attempt has been made to discredit this class of testimony by showing even that Mr. Martin was reticent with his neighbors. And the life of this family, living together under one roof, working together to all appearances for a common end, addressing one another in language of the hearthstone, expressive of filial ties and the filial affections; all these things, as was said by Judge VALLIANT for this court in Lynn v. Hockaday, 162 Mo. 111, 124, speak louder than words "and these acts testify to what the agreement was more surely than witnesses who attempt to repeat the substance of conversations which they listened to twenty years before." It is said that all this testimony is uncertain and valueless on account of the absence in most instances of the word adopt. It seems to be contended that these other expressions—that Mr. Martin would take him as his own son and that he was his own son and his child and that he would get all he had when he died—are valueless to prove such a contract as is here asserted because they do not state the name of a legal process or proceeding by which all this was to be accomplished. It is true that they only express the result to be attained and not the details of its accomplishment. In the case we have just cited, which bears a striking resemblance to this, it was said by the man who took the child "that the grandmother had given her to them to raise as their child." Of this language Judge VALLIANT said: "When we consider who the old grandmother who dictated the terms was, and her condition in life, we cannot expect her to have been posted as to the technical requirements of the statute in regard to adoption, but we see that she did understand the difference between merely giving the child out to service or. to rear, and giving her to one who would take her for his own child. Her words were as descriptive of the condition as if she had used the technical word adoption."

The rule so well expressed in the above quotation
is of universal application. Contracts may be made in
the plain language understood by those who make
them. Should a vendor say, "I have sold the white
acre to A. for $1000 which he has fully paid to me,"
it would be futile to deny that the writing containing
the statement constituted a contract for the sale of the
tract of land described because it did not also contain
an agreement to make a deed; for all things necessary
to effectuate the sale would be included within its
terms. It is objected also that when Mr. Mann asked
Mr. Martin if he had made any provision for Frank
the answer was that he did not feel it was necessary;
that Frank was his child and he considered him his
son. This is interpreted by the appellant as a declara-
tion by Mr. Martin that he was under no obligation
to execute any act of adoption and as a denial that
he had agreed to do so. This is only an expression of
opinion at the very most. If he had agreed to make
the child his son so that he would take his property
at his death, and this could only be done by formal
adoption, then he was bound formally to adopt him.
If he did not believe this was necessary that opinion
would not affect the character of his undertaking. It
may be that he had been advised and believed that no
further act than his public recognition of the relation
was necessary. A majority of the judges of the United
States Circuit Court of Appeals in Adger v. Ackerman,
115 Fed. 134, were of the opinion that under the Mis-
souri statute to which we have already referred, the
recognition by the husband of the illegitimate children
of the wife born before the marriage, is conclusive
evidence that he is their father and legitimates them,
and this court, in Breidenstein v. Bertram, 198 Mo.
328, 347, seemed, from the complimentary manner in
which it referred to and quoted the opinion of Judge
THAYER in the former case, to be then unprepared to
disapprove that proposition. We think that in the

light of this judicial uncertainty, Mr. Martin was excusable if he thought that he had done all he could and all the law required to be done to place Frank in the position of his son and heir.

The evidence in this case being of such a nature that it leaves no substantial doubt, in our minds, that at the time of the marriage of Mr. and Mrs. Martin it was agreed between them that in consideration of the marriage he would make her child his own, it was his duty to fulfill the obligation so assumed by doing all acts necessary to the accomplishment of that purpose to the fullest extent permitted by law. If it required the execution of a deed of adoption under the provisions of the statute to invest the plaintiff with all the rights of a legitimate child, which we will assume to be the case but find it unnecessary to decide, then it was his duty, in the performance of his obligation, to execute such deed. Having failed to do so the court in the exercise of its equitable jurisdiction should, as has been done in this case, enforce the rights growing out of such duty.

"Equity looks upon that as done which ought to have been done." [1 Story's Eq. Jur. (12 Ed.), sec. 648.] "All agreements are considered as performed which are made for a valuable consideration, in favor of persons entitled to insist on their performance. They are to be considered as done at the time when, according to the tenor thereof, they ought to have been performed." [*Ibid.*] This maxim has been correctly looked upon as the very foundation of all distinctly equitable property rights, of all equitable estates and interests both real and personal. [1 Pomeroy's Eq. Jur., sec. 364.] It has been called "a fruitful maxim." Its application to this case is well illustrated in Frederick v. Frederick, 1 P. Wms. 710. A man had contracted at the time of his marriage, to become a citizen of London, but died before he had done so by taking up his freedom. His widow brought suit for the

distribution of his personal estate according to the custom of London, which applied only to citizens. Lord Chancellor MACCLESFIELD in deciding the case said: "Mr. Frederick having upon good consideration made the agreement to become a freeman of London within a year, and having survived that year, he shall in equity be taken for a freeman, and his personal estate distributed accordingly."

So in this case, Mr. Martin having agreed, for a valuable consideration, which has been fully performed, to adopt the plaintiff, that act will be taken in equity as having been done in time and manner contemplated in the agreement. We have carefully examined the cases cited by the appellant, and find nothing in them contrary to the conclusion here indicated.

It follows from what we have said that the judgment appealed from is right, and it is accordingly affirmed, and the cause remanded for further proceedings.

PER CURIAM.—The foregoing opinion of BROWN, C., is adopted as the opinion of the court. All the judges concur.