Kelsey NORMAN and Ruth Norman,
*Respondents,*

v.

Maynard L. DURHAM and Mary Jo Durham,
and the Carthage Loan and Investment
Company, a Missouri Corporation, Appel-
lants,

The First National Bank of Kansas City,
Missouri, Intervenor.

No. 49545.

Supreme Court of Missouri,

Division No. 2.

June 8, 1964.

Motion for Rehearing or for Transfer
to Court En Banc Denied
July 13, 1964.

Charles D. Tudor, and Emerson Foulke, Joplin, for respondents.

Herbert Van Fleet, Joplin, for (defendants) appellants; Seiler, Blanchard & Van Fleet, Joplin, of counsel.

PRITCHARD, Commissioner.

■ This is an action for declaratory judgment as to the rights of the parties to a joint adventure agreement, dated December 2, 1954, for the development of residential subdivisions in the southeast part of Joplin, Missouri, in which the plaintiffs sought also a direction to the trustee to whom the parties had conveyed their "pooled" real properties to reimburse them for certain developmental expenses, and ultimately for the partition of 143 lots remaining unsold in the hands of the trustee as between the parties plaintiffs and defendants. The defendants, by answer, sought a declaration of forfeiture of all of plaintiffs' interest in said remaining lots by reason of claimed defaults in plaintiffs' performance of the agreement as per a forfeiture provision thereof. We thus have jurisdiction of this appeal by reason of title to real estate being involved. This case comes to the writer by assignment after reargument was had upon motion for rehearing being granted. As noted below, judgment in the trial court was substantially in accordance with plaintiffs' prayer, and defendants appeal.

The now pertinent portions of said agreement which was between L. S. Durham, Maynard L. Durham and Mary Jo Durham, his wife, and George E. Phelps, Trustee under the will of John E. O'Keefe, deceased, first parties, and Kelsey Norman and Ruth Norman, his wife, second parties, are to the following effect: It is first recited that the parties are owners of certain lands and that "it is deemed desirable by the parties to combine efforts to encourage development of the area by location of school, shopping center and residences on the lands owned by the parties." By paragraph 1, first parties agreed to donate approximately 32 acres

of land without charge to the School District of Joplin, in consideration of which second parties agreed to convey to first parties or to the Carthage Loan and Investment Company (trustee) certain lots in Southmorland Acres, an addition to Joplin, or in lieu thereof 20 acres of land. Second parties agreed at their expense (a) promptly to plat first parties' land in compliance with city ordinances and to meet FHA and Veterans' Administration requirements as far as practicable; (b) within a reasonable time to open up and gravel either Grand Avenue or Missouri Avenue from 26th Street to 20th Street; to open up 26th Street from Grand to Wisconsin Avenue, to open up Indiana Avenue to at least 28th Street; (c) as to any street which may be opened, gravel and rock piles were to be leveled and mine shafts filled to the rear line of lots adjacent to such streets; * * and (g) to open up additional blocks as soon as those already opened were substantially disposed of or as market conditions required. By paragraph 4, second parties agreed in the event that under existing ordinances or under applicable regulations of FHA or other lending agencies it was necessary to install sidewalk or curb or gutter or utilities or other improvements before the sale of lots, they would advance the sums necessary therefor but not exceeding one block at a time. Paragraph 5 provided that second parties would advance the sums necessary to satisfy special assessments for sewer, street, gutter or other improvements but only as to lots which had not been sold. In paragraph 6 it was provided that the proceeds of the sale of lots after deducting revenue stamps and the trustee's fee should be distributed by paying first parties $200.00 per acre for streets, alleys and dedicated areas (except the high school dedication) to be allocated to lots and the balance to be first applied to reimburse second parties for expenditures in improving property, and then a division was to be made one-half to first parties and one-half to second parties.

The provision for forfeiture of plaintiffs' rights under the agreement as relied upon by defendants first provides for notice of the violation of the agreement and for termination of the agreement if the violation is not rectified within 30 days. Then as it applies to the claimed default of plaintiffs (second parties), "the trustee shall immediately convey the property the subject of this agreement or portions thereof remaining unsold to first party, their successors and assigns, and first party their successors and assigns shall be without further obligations to second party under the provisions of this agreement."

Mr. L. S. Durham died prior to the execution of said agreement and his interest in the property passed by survivorship to Maynard L. Durham; Mr. George E. Phelps died in 1958, and the First National Bank of Kansas City was appointed successor trustee under the will of John E. O'Keefe, deceased; and Mr. Kelsey Norman died on November 12, 1961, while this case was under advisement in the trial court, and his spouse, Mrs. Ruth Norman, became the sole plaintiff herein.

The essential findings and interlocutory decree (designated to be an appealable order by the trial court under Supreme Court Rule 82.06, V.A.M.R.) below were that the trustee, Carthage Loan and Investment Company, upon its request be relieved of all responsibilities or liabilities under said agreement, except to hold bare legal title to unsold lots of the parties in Durham Acres, and that from $35,722.00 held by it as trustee, it deduct $1,197.18 for all its compensation, including attorneys' fees, which was allowed by the court, and which included $97.18 premium for a liability insurance policy on the property of the parties, and that the balance, $34,524.82, be paid to the Clerk of the Court to be by him held pending final disposition of the main cause of action [it being found that defendants were entitled to be reimbursed for 12.82 acres of land at $200.00 per acre pursuant to the agreement, which land had been sold to one White, or $2,564.00, it being found also that other land conveyed into the pool by defendants, the Durhams, should be likewise

compensated; that Ruth Norman, as surviving joint tenant to Kelsey Norman, deceased, was entitled to $10,254.80 reimbursement for developmental expenses paid, and that she also receive one-half, or $10,853.01, and that the defendants Durham and intervenor First National Bank of Kansas City (successor trustee as above stated) were to receive the other one-half, or $10,853.01, of the remaining cash from the trustee]. The court also ordered that partition in kind be had of the remaining unsold lots in Durham Acres: Lots 1 to 50; Lots 75 to 114; and Lots 139 to 191, all inclusive, and appointed three commissioners to set off the same, one-half in value, to each party, and allowed a lien upon the lots set off to Ruth Norman of $200.00 per acre in favor of the defendants.

■ In our review of this court-tried case we consider both the law and evidence, in nature de novo, but we give due deference to the trial court's findings and opportunity to observe and judge the credibility of the witnesses testifying. Supreme Court Rule 73.01(d), V.A.M.R.; Faire v. Burke, 363 Mo. 562, 252 S.W.2d 289, 290 [1]; Saville v. Bradshaw, Mo., 359 S.W.2d 676, 678 [2].

The evidence shows that immediately after the agreement was executed, second parties by Mr. Norman proceeded to have the entire area cleared of brush and trees, and that he at least delineated the streets (Grand Avenue, Missouri Avenue, Iowa Avenue, and the east-west 24th and 26th streets). This work was completed early in 1958. Mr. Norman claimed that Indiana Avenue on the east was at all times "passable," with one area toward the north which was impassable in wet weather, as was 26th Street on the south side of the tract. After defendants Durhams conveyed 32 acres to the Joplin High School, the buildings thereon were built, and the school paid for grading Indiana to the south end of its school grounds which is 24th Street. From 24th Street on to the south to 26th Street, Indiana Avenue was graded, grav-

eled and paved by the city of Joplin, to which action Mr. Norman registered protest. Mr. Phelps, as trustee, sold to the Durhams 50 acres of land in the south portion of Durham Acres for $5,200.00, and used that money to purchase from the Durhams a one-fourth interest in the total contract.

Mr. Norman and his wife conveyed to the trustee approximately 20 acres of land (12 lots) in Southmorland Acres, previously owned by him and which abuts Indiana Avenue on the east, north of 26th Street. In 1958, this land was sold to one Ruestman, completely unimproved other than platting, for $44,000.00, which was paid to the trustee upon its conveyance. Apparently a residue of these funds was in the trustee's hands at the time this action was brought on February 24, 1959. Also, shortly after the agreement was executed, the Durhams conveyed their land (including that conveyed to them by George Phelps, trustee), now known as Durham Acres, to the trustee, and this tract was duly platted and the plat was accepted by the City of Joplin on October 17, 1955. On April 12, 1955, Mr. Norman and his wife made a contract with one W. A. White for the sale of lands within Durham Acres, then not platted, by distances, metes and bounds descriptions, and with no improvements thereon, which contract obligated White at his expense to bring to the grade established by the City of Joplin Missouri Avenue, East 25th Street, and to install curbs and gutters on the north side of 26th Street, the north and south lines of East 24th and 25th streets, if necessary, and the east and west lines of Missouri Avenue from 24th to 26th streets, and to install, ready for use, all sewer lines and connections required to serve all lots and necessary utilities within the land conveyed. The contract with White further provided that no conveyance would be made by the trustee until all of the specified costs were paid. White did receive deeds to this property from the trustee, a total of 48 lots in Durham Acres, and the parties divided the $24,000.00 purchase price equally without

its passing through the hands of the trustee. Curiously, as the photographs taken as late as January, 1961, indicate, Mr. White had made none of the improvements specified in his contract.

On March 19, 1957, the City of Joplin was notified by letter from the State Bureau of Public Health Engineering that the Turkey Creek Sewage Treatment Plant in North Joplin was overloaded and a serious public health hazard to the community and downstream property owners; that the Shoal Creek Sewage Treatment Plant in West Joplin was nearing design capacity; that in view of the critical overload of the Turkey Creek Plant extensions of the public sewer system tributary to the plant could not be approved by the Division of Health until adequate sewage treatment facilities have been assured; and it was recommended that the City proceed at an early date with financing of the essential sewage treatment plant expansions and extensions of needed sewers to serve the entire city.

On May 14, 1957, a second election was held by which the voters in Joplin approved the issuance of bonds for expansion of the sewage treatment plants and the sewer system. Immediately thereafter permits were issued by the City for residents to attach to public sewers, and final approval was had by the Division of Health. During all of this time Mr. Norman had informed Mr. Durham that it was not possible to develop Durham Acres because sewers could not be installed, and this position was continued up to the time the parties came to a parting of the ways (on February 2, 1959) and Mr. Norman stated to Mr. Durham and Mr. Peterson of the First National Bank that he was not obligated to install sewers, and that he did not intend and never intended to do so. Mr. Durham on February 16, 1959, issued a notice to Mr. Norman of the defaults in performance claimed by Mr. Durham to have been had, and on March 19, 1959, made demand upon the trustee to convey the remaining lots in Durham Acres to the Durhams in accordance with the forfeiture provision of the agreement. This

suit was then instituted by Mr. Norman seeking a declaration of the rights of the parties to the agreement, reimbursement for his expenditures thereunder, and partition of the remaining unsold lots in Durham Acres. Essentially, we deem that this suit is one merely for termination of the joint adventure of the parties, with an accounting and a division of the property thereof, but with the added features of a requested construction of the agreement and defendants' defense and prayer of forfeiture of plaintiffs' rights under that provision of the agreement.

■ Mr. Norman's contention at the trial was that the agreement did not obligate him to put streets in to grade (but merely to open them up so they were passable), to install curb and guttering, sewers and other improvements. At the trial, the parties were in disagreement as to what was meant by the term "open up" streets in Durham Acres. The contract does not specify who should install sewers, but only that Mr. Norman would advance necessary sums for the special assessments therefor. However this may be, Mr. Norman has himself supplied the deficiencies and resolved the ambiguities in the written agreement by his letters of October 11 and 25, 1955, to the Federal Housing Administration, in which he informed it that he had obligated himself to install sanitary sewers in the addition, to cut streets through and bring them to grade, to cover the traveled surface with four inches of gravel and to construct curbs and guttering along the streets in accordance with city ordinances. This construction of the agreement was again affirmed by Mr. Norman in his letter to Mr. Durham of October 3, 1958, almost three years later, in which he alluded to the White contract and stated to the effect that White's obligations to cut through and bring to grade certain streets in the southern part of Durham Acres relieved Mr. Norman and his wife from doing those things. The construction by Mr. Norman as to his obligations under the agreement coincided with those of Mr. Durham and Mr. George

Phelps. Ryley-Wilson Grocer Co. v. Seymour Canning Co., 129 Mo.App. 325, 108 S.W. 628, 630 [3]. These admissions of Mr. Norman were against his interest and are binding upon him. Lene v. M. F. A. Mutual Insurance Co., Mo.App., 301 S.W.2d 874, 876 [2]; Lawton-Byrne-Bruner Ins. Agency Co. v. Stiers Bros. Const. Co., Mo. App., 186 S.W.2d 480, 486 [8–10]. See also Hoppock v. Gaines, Mo.App., 284 S.W. 191, 194 [7], where the court said, "It is a familiar rule of construction that, if the terms of a contract appear to be ambiguous and the parties seeking to enforce it or to recover for its breach have put a construction upon it that is inconsistent with his position in the trial and not inconsistent with a reasonable construction of its terms, he should be bound by his own construction of it." We therefore rule that Mr. Norman did have the obligations to cut the streets to grade, install sewers, and curb and guttering (at least after the impediment was removed to the performance of all of these matters by the bond issue and subsequent permits for sewer extensions after May 14, 1957). We rule further that there was a partial failure of performance by Mr. Norman of his contractual obligations, but the more serious question and principal issue here is whether defendants are entitled to enforce the forfeiture provision of the agreement by reason of plaintiffs' defaults.

It is well settled that forfeitures are not favored by either law or equity. Bogad v. Wachter, 365 Mo. 426, 283 S.W.2d 609, 613 [2, 3]; Cox v. Fisher, Mo., 322 S.W.2d 910, 914 [2–4]; Plymouth Securities Co. v. Johnson, Mo., 335 S.W.2d 142, 152 [7–9]. In the instant case plaintiffs, Mr. and Mrs. Norman, conveyed approximately 20 acres of land (the Ruestman tract) into the pool. This land was sold, and the residue of the sale price was in the hands of the trustee at the time suit was instituted. In addition, Mr. Norman did perform valuable services to the enterprise in procuring the location of the High School in the area so that all the properties of the parties would be enhanced in value. He procured the sale of some 48 lots within Durham Acres to White, to the benefit of all concerned, without any expenditures for improvements, for $24,000.00, which funds were divided. By these acts, despite the recalcitrancy of Mr. Norman with respect to the installation of sewers, he and Mrs. Norman acquired a *vested* interest in the remaining unsold lots in Durham Acres. "A forfeiture imposes a loss. The forfeiture of an estate in property means its loss without compensation. It is the taking away of some preexisting valid right. One of the reasons forfeitures are not favored is that they destroy estates. Generally, a valid estate is destroyed by forfeiture for the violation of a condition either by the omission or commission of some act." Swain v. Maxwell, 355 Mo. 448, 196 S.W.2d 780, 785 [17, 18]. Forfeitures cannot and should not be declared when the rights of the parties have become vested. Missouri State Life Ins. Co. v. Foster, 188 Ark. 1116, 69 S.W.2d 869, 871 [5–7]. The forfeiture provision here is not based upon a condition, but upon a promise or covenant to perform. Ordinarily, upon breach of such a covenant an action for damages therefor will lie, and if the damages should be difficult, incapable or impossible of ascertainment it is competent for the parties to stipulate for liquidated damages. Even if the provision that the trustee should convey remaining unsold lots to defendants upon plaintiffs' violation of the agreement be treated as a provision for liquidated damages, it is not enforceable as a contract unless the property forfeited is a reasonable forecast of just compensation for the harm caused by the breach, and such harm is incapable or very difficult of accurate estimation. Williston on Contracts, 3rd Edition, §§ 769, 770; 1 Rest. Contracts, § 339; Corbin on Contracts, §§ 1057, 1059.

In Plymouth Securities Company v. Johnson, Mo., 335 S.W.2d 142, 152 [7–9], it was said, "Also if the amount or value of the property stipulated as liquidated damages for breach of contract is greatly disproportionate to the ensuing loss, the court

will construe it to be a penalty and restrict the damages recovered to those actually suffered." See also Abrams v. St. Louis County Library Dist. Board, 364 Mo. 25, 258 S.W.2d 672, 675 [1]; Buchanan v. Louisiana Purchase Exposition Co., 245 Mo. 337, 149 S.W. 26, 29 [4]. In this case the only competent evidence of the value of the remaining lots in their then condition was an appraisal made by Messrs. McAllister, Richardson and Swanson, realtors, on September 19, 1958. This value was then set at $48,700.00 for the 143 remaining lots, unimproved. There is no evidence that plaintiffs' one-half of this value, or $24,350.00, sought by defendants to be forfeited by a conveyance to them bears any reasonable relation to the harm or damage (of which there is also no evidence) suffered by them because of Mr. Norman's defaults in performance. For this, and the above reasons, we decline to declare the provision in the agreement for forfeiture enforceable.

Defendants' next point is that the trial court erred in holding that they should receive $200.00 per acre only out of the land (Durham Acres) conveyed by them to the trustee, and not out of the land (Southmorland Acres) conveyed by the plaintiffs. As noted, the agreement provided that the proceeds of the sale of lots "should be distributed by paying first parties $200.00 per acre for streets, alleys and dedicated areas (except the high school dedication) to be allocated to lots, * * *." It is true that this provision does not exempt plaintiffs' land specifically, nor does it refer to any land. However, the trial court properly construed this provision in his finding, "It would seem to the Court to be a rather strained construction to say that defendants were to first receive $200.00 per acre for land included in the pool by plaintiffs, while it would be only a natural construction to have a provision apply to land transferred to the pool by defendants. This would undoubtedly be for the purpose of assuring to defendants the value of the land to offset the 32 acres given to the school district. The contract was finally consummated and executed on December 2, 1954. Plaintiffs' Exhibit No. 42 is a letter dated October 15, 1954 from Mr. Norman to Mr. Phelps. In that letter Mr. Norman stated: 'In my letter of August 30th I mentioned the fact that I thought you all should get $200.00 per acre for your land out of the first money received from lot sales.' This apparently was the basis for the provision in the contract on this particular matter and the Court finds that the proper interpretation of the contract would be to allow defendants $200.00 per acre for land which they put into the pool and not for the land conveyed by plaintiffs." The letter was admissible to explain this ambiguous provision of the agreement. We discern no error in the trial court's finding, and this point is ruled against defendants.

Plaintiffs' expenditures for improvements made upon Durham Acres by Mr. Norman were supported by the evidence. However, the interest allowed upon a sewer tax assessment in the amount of $81.46, for which Mr. Norman would be responsible for his delay in payment of this assessment as per his agreement, should be excluded. Exhibit 54 is a check for $228.00 for abstracts to the Ruestman tract, but Mr. Norman conceded at the trial that he was to stand all this charge except $100.00. We compute plaintiffs' expenditures as follows:

| | |
|---|---|
| To Freer Construction Company, clearing land and cutting through streets | $ 5,142.00 |
| To William Stewart Engineering Co., platting and surveying and photographs | 3,668.00 |
| To Koelker Engineering Co., blueprints | 8.00 |
| To Lee's Letter Shop, abstract copies | 100.00 |
| To J. C. Bodine, air compressor and drill rental | 38.95 |
| To City of Joplin, filing plat | 15.00 |
| To Bard & Bard, sewer tax assessment | 1,186.93 |
| To O. D. Irwin, labor and material, blasting | 122.46 |
| | $10,281.34 |

Apparently the court omitted the $100.00 abstract bill, the $8.00 blueprint bill, and the court included the $81.46 interest on the sewer tax bill, thus creating the difference in our computation from that of the court below. Because plaintiffs' expenditures are an issue on this de novo appeal, we conclude

that the correct sum thereof is $10,281.34 instead of $10,254.80 as computed by the trial court.

■ Defendants contend that the court erred in finding that plaintiffs had an undivided one-half interest in the unsold land held by the trustee because there is nothing in the contract so providing or susceptible of such construction. We rule otherwise subject only to defendants being reimbursed at the rate of $200.00 per acre for the land they put into the pool, and the reimbursement for plaintiffs' expenditures. After these charges upon the proceeds of the sale, the remainder was to be divided equally. Not only does the agreement so provide, but the parties so treated it. This point is ruled against defendants.

■ Defendants contend that plaintiffs are not entitled to partition because the agreement did not vest any "estate for life or a conditional or contingent or other estate of uncertain vesting or duration with remainder over or reversion, or an estate to commence in the future," and that the person bringing the action "must hold an estate or interest therein carrying the right of immediate use and enjoyment of such lands." Having conveyed the legal title to their properties to the trustee, these parties have an *equitable* title to the remaining unsold lots in Durham Acres, their respective interests being subject to the aforesaid charges. Under Section 528.030, RSMo 1959, V.A.M.S., partition of these equitable interests may be had. Martin v. Martin, 250 Mo. 539, 157 S.W. 575, 577 [1, 2]; Reed v. Robertson, 45 Mo. 580, 583. Phelps v. Domville, Mo., 303 S.W.2d 601, cited by defendants, is not in point on this issue because that case involved merely the right of a holder of a dower interest to bring partition which was held unauthorized under the statute. Plaintiffs asked that the interests of the parties be ascertained in the land described in the petition, and that it be partitioned in kind and if not susceptible to such partition, that it be ordered sold and the proceeds divided. Defendants and the intervenor, First National Bank of Kansas City as trustee under the will of John E. O'Keefe, pleaded the interest of that estate. These interests were found as stated by the court, and properly so, under all of the pleadings and the evidence. The trustee of the subject land, holding bare legal title, may convey to the parties whatever lands the appointed commissioners set off to them. If it should be found that the lands are incapable of being partitioned in kind, the trustee may divest itself, under order of the court, of its bare legal title revesting the parties therewith, in order that sale may be had of the lands at public vendue.

The judgment of the trial court is modified in these respects: The clerk of the court shall pay to defendants $2,564.00 for 12.82 acres of land sold to White and to plaintiff, Mrs. Ruth Norman, $10,281.34, from the funds in his hands ($34,524.82), and the remaining amount, $21,679.48, shall be divided, one-half to plaintiff, Mrs. Ruth Norman, and one-half to defendants, Maynard L. and Mary Jo Durham, and to intervenor, The First National Bank of Kansas City as trustee under the will of John E. O'Keefe, deceased. Otherwise the judgment is affirmed and this case is ordered remanded for entry of the above modification and for further proceedings.

BARRETT, C., not sitting.

STOCKARD, C., concurs.

STORCKMAN and LEEDY, JJ., concur.

EAGER, J., dissents in separate opinion filed.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

EAGER, Judge (dissenting).

This litigation has had a long and tedious history and I regret the necessity of a dissent. An opinion was filed here on September 9, 1963, but thereafter a rehearing was granted. I concurred in that order, although I wrote the original opinion.

The parties seemingly agree that this is basically a law action, although counsel for plaintiffs insist that it is "sui generis"; that insistence is true, so far as it goes, but a declaratory judgment action must still sound either in law, or equity, or both.

The principal opinion, in dealing with the abhorrence of forfeitures, relies largely upon equity cases. Bogad v. Wachter, 365 Mo. 426, 283 S.W.2d 609; Plymouth Securities Company v. Johnson, Mo., 335 S.W.2d 142; Cox v. Fisher, Mo., 322 S.W.2d 910. The statement has often been made that "equity abhors a forfeiture." On the law side the more or less equivalent question usually arises in suits for damages for breach of contract where the recovery of liquidated damages or of a penalty is sought. There it has been held that the courts will not enforce a provision for the recovery of a penalty or of punitive damages, but that they will enforce provisions for liquidated damages if the amount fixed is proportionate to the amount of damage reasonably to be contemplated. Wilt v. Waterfield, Mo., 273 S.W.2d 290; Restatement of Contracts, § 339, and comment; Buchanan v. Louisiana Purchase Exposition Co., 245 Mo. 337, 149 S.W. 26, 29; Abrams v. St. Louis Co. Library Dist. Bd., 364 Mo. 25, 258 S.W.2d 672, 675. But all such authorities recognize that if the contract provisions for damages are not enforceable, then the party against whom the default has been committed is entitled to such damages as he has actually suffered. Thus, in Wilt, supra, the Court said: " 'Where the sum named in a contract to be paid in a breach is held to be a penalty and not liquidated damages, the amount of recovery is only the actual damages sustained.' 25 C.J.S., Damages, § 116b, p. 704.' "

The writer of the principal opinion has found that Mr. Norman was in default in several respects in his performance under this contract. As the writer of the original opinion, I so found, and in somewhat more detail. At this point I add the following factual comments from my construction of the record, all of which bear upon the question of damages. The defendants had contributed 58 acres to this "pool" of land, in addition to the 32 acres which they *gave* to the School District as a part of the consideration for this contract; Mr. Norman contributed 19.14 acres; the contract was dated December 2, 1954, and the lots which are now in question have been permitted to lie idle ever since, while surrounding areas have been substantially developed; on February 2, 1959, Mr. Norman specifically refused to do anything more under the contract. It is obvious that *this* Court cannot intelligently determine whether defendants have been damaged by Norman's breach and, if so, by how much. We have been informed by plaintiffs' counsel, strictly outside the record, of various subsequent developments and changes in the status of the property.

It adds nothing to say that Norman acquired a "vested" interest. If he did, he acquired it subject to the terms of the contract, so we are right back where we started, with the necessity of applying the applicable rules to the contract itself.

I am not fully convinced that the provision for the reconveyance of the unsold lots to defendants was wholly out of proportion to the damages to be anticipated, as the Court has now found. This should have been considered in the light of all the circumstances, including the very substantial benefits given up by the defendants and those acquired by Norman. However, in order to work toward some end to this tedious and perhaps unnecessary litigation, I shall concur in the holding that it constituted a penalty. But that holding does not end the difficulty. The principal opinion totally ignores the fact that defendants are entitled to a hearing and finding on the

question of damages. The trial court found that there was no breach, and therefore no damages would follow. It ordered a partition and a division of the money on hand. This Court independently finds a breach (of which I have no question), ignores the question of damage suffered from the breach, and orders a partition and distribution as did the trial court upon a directly opposite finding.

I would reverse the judgment and remand the case for a full hearing on the question of damages, the ultimate judgment to conform to the principles and findings otherwise announced in the opinion.