FRANK J. BOGAD, Administrator of the Estate of EMMA BOGAD, Deceased, and FRANK J. BOGAD, Administrator d.b.n. of the Estate of MIKE BOGAD, Deceased, Appellants, v. HARRY A. WACHTER and R. L. BUTTERWORTH, Respondents, No. 44659—283 S. W. (2d) 609.

Division Two, September 12, 1955.
Rehearing Overruled in Per Curiam Opinion Filed, November 14, 1955.

*Herbert F. Hahn* and *Horace T. Robinson* for appellants.

*Robert M. Zeppenfeld* and *Breuer & Northern* for respondents.

428

[610] BOHLING, C.—This is an appeal of a suit in equity instituted by Mike Bogad and Emma Bogad, husband and wife, of St. Louis County, Mo., against Harry A. Wachter and Mrs. R. L. Butterworth, of St. Louis, Mo., for the specific performance of a contract to sell to plaintiffs certain real estate, for the restoration of the possession of the property in plaintiffs, for an accounting of the rents and profits after plaintiffs had been dispossessed, and for general equitable relief. We refer to the parties as plaintiffs and defendants. Defendant Wachter considered plaintiffs had breached their contract with respect to payments of the monthly installments and put one Fred Rauhaut in possession. Plaintiffs in an amended petition made Fred Rauhaut an additional party defendant on the theory the original defendants had contracted to sell the property to him. However, all controversies raised by the pleadings between Rauhaut and plaintiffs and Rauhaut and the original defendants were disposed of by stipulation and dismissal during the progress of the trial. Thereafter, the chancellor found the original defendants had not waived the contract provisions for the payment of the monthly installments and dismissed plaintiffs' petition. Plaintiffs appealed.

Mike Bogad and Emma Bogad departed this life and Frank J. Bogad, administrator of the estate of Emma Bogad, deceased, and Frank J. Bogad, administrator d. b. n. of the estate of Mike Bogad, deceased, have been substituted as parties appellants.

Mr. Bogad came to America in 1922. Mr. and Mrs. Bogad were married in St. Louis in 1923. Each was a native of Austria-Hungary, and received a sixth grade education. He was a plasterer by trade, later a plasterer contractor, and for 15 years did plaster work for Mr. Wachter.

Mr. Wachter was a real estate agent, was secretary of the Surety Home Savings and Loan Association, and also constructed houses. He and the Association had offices at 2011 South Broadway, St. Louis, Mo. He owned the property involved known as the Tulane Trailer Court near the Fort Leonard Wood Military reservation, Pulaski county, Mo. He placed the title in Mrs. R. L. Butterworth, his daughter, on account of his age, being approximately seventy.

Bogad testified that Wachter and he inspected the Trailer Court; that Wachter informed him the water facilities would have to be

lowered below the freezing line; that the wooden sewer would hold for 10 or 15 years, and that a septic tank was not needed. Wachter asked $15,000 for the property. (Bogad and Fred Rauhaut had discussed the purchase with the thought that if Bogad put in $3,500 and Rauhaut $2,500 they could make the Trailer Court attractive and operate it as a partnership. Rauhaut never paid his $2,500.) Bogad informed Wachter he would purchase if he could raise $3,500 by an additional loan on his home. Wachter arranged for the Surety Home Savings and Loan Association to make the loan.

Mr. and Mrs. Bogad went to Wachter's office and a written contract, dated August 20, 1951, for the sale and purchase of the property—the land and 8 trailers—was [611] executed by Wachter as agent, signing "R. L. Butterworth by H. A. Wachter," as party of the first part, and Mike Bogad and Emma Bogad, as parties of the second part. So far as material, the vendees were to pay $15,000 (with 4% interest on unpaid balances), payable in monthly installments of $400 each at Wachter's office in St. Louis, the first payment becoming due September 20, 1951. The vendees could pay the outstanding balance at any time. The contract provided in part:

"Time is expressly made the essence of this contract and if Parties of the Second Part fail for 30 days after any monthly installment becomes due and payable to pay same, then this contract shall become null and void and Party of the First Part shall retain all payments made as liquidated damages and may sell said property to other parties for their own benefit."

Mr. and Mrs. Bogad could read English. Bogad testified he had his son read the specifications in the plastering contracts "down for me so I could understand what that would mean." Wachter read the contract to them. Mrs. Bogad testified she read the contract at Wachter's suggestion but she did not understand everything that was in it. The Bogads understood the property was costing $15,000, payable $400 monthly, beginning September 20, 1951.

Several adjournments of the trial occurred. When all the issues involving defendant Rauhaut were disposed of, as stated in the first paragraph hereof, which occurred prior to plaintiffs taking up the accounting feature involving rents and profits after plaintiffs had been dispossessed, the court and counsel for the litigants agreed that the first issue to be determined was that commonly known as "waiver," i.e., whether defendants had waived the provisions making time of the essence of the contract for default in the payment of the $400 monthly installments; and if defendants had not waived said contract provisions there was no occasion to hear evidence on the rents and profits after plaintiffs were dispossessed. The trial so proceeded, resulting, as stated, in plaintiffs' petition being dismissed.

Bogad took possession of the property. He received the proceeds of a $3,500 loan by increasing the loan on his home to $8,889. The water

pipes had to be installed before freezing weather, and he started making improvements. In about two weeks the State Health Department informed him the sewer facilities had to be improved or the Trailer Court would be condemned. Bogad secured plans and started to improve the sewer facilities. He also constructed a pump house and improved ''a 3-room shack.''

Bogad rented trailers and also rented space to owners of trailers. He testified he collected at least $500 a month in rents, and sometimes the collections were between $600 and $700 a month. He had to pay the operating expenses of the Trailer Court, such as expenses for electricity, water, oil et cetera, and his payments to the Loan Association.

With respect to the $400 monthly payments to begin September 20, 1951, the record is to the effect that Bogad made deposits as follows to the credit of Wachter in the Waynesville Security Bank:

Payment due September 20, 1951—credited October 3, 1951.
Payment due October 20, 1951—credited November 1, 1951.
Payment due November 20, 1951—$300 credited December 5, 1951.
Payment due December 20, 1951—$300 credited January 7, 1952.
Payment due January 20, 1952—$300 credited February 1, 1952.
Payment due February 20, 1952—no credit.

Mr. Bogad is plaintiffs' only witness on the issue of waiver. It is true as defendants state that Bogad's testimony is confusing and contradictory in places; but certain essential facts are not disputed. Some of [612] the confusion may arise from his lack of a precise knowledge of the English language. The court suggested that counsel state their questions plainly and give him time to answer. Bogad testified that Wachter made trips to the Trailer Court and on one or two occasions Robert M. Zeppenfeld was with him. The substance of his testimony is that until some time in February, 1952, when Wachter and Zeppenfeld came to the Trailer Court, Wachter never complained to him about the time of his making his payments or the amount of his payments; that on one occasion he told Wachter many soldiers had been moved and he had only $300 and Wachter said that was all right, he could catch up with the payments in the Spring. Bogad did say that Wachter saw him about the payment due September 20, 1951; and then that it was not about the payment but about the work he, Bogad, was doing. On one or two occasions Bogad's answer gave the impression he made the payments at Wachter's office in St. Louis. The payments were deposited to Wachter's credit in the Waynesville bank. Bogad so testified later, and from other testimony he meant he took the deposit slip to Wachter's office for Wachter to credit the payment in Bogad's receipt book. He testified that when Wachter and Zeppenfeld came to the Trailer Court in February, 1952, and complained about the payments and wanted to check his records, he told Wachter he would

bring his records, which were in St. Louis, to Wachter's office the following Saturday.

Wachter throughout his testimony denied that he ever agreed to forego the prompt payment of any of the $400 installments or agreed to the payment of lesser amounts. He testified: When he did not receive the $400 due September 20, 1951, he, with Mr. Zeppenfeld, his attorney, made a trip to the Trailer Court, told Bogad his $400 monthly payments should be made when due, and made arrangements for Bogad to deposit the payments in the Waynesville Security Bank instead of Wachter's office in St. Louis. He received a deposit slip through the mail from the bank on October 5th, showing Bogad had deposited $400 on October 3rd to Wachter's credit. When the $400 payment due October 20th was not paid, Wachter again made a trip to the Trailer Court and told Bogad he would have to make the payments promptly. On November 1st he received a deposit slip covering the payment due October 20th. The $400 payments due in November, December and January were not made on the 20th of the month. Wachter made trips to the Trailer Court and complained to Bogad about his failure to pay on the 20th. When he received the $300 deposit slip on December 5, 1951, he went to the Trailer Court and protested to Bogad about his failure to meet the terms of his contract. When he received the deposit slip on January 7, 1952, he wrote Bogad on January 9, 1952, stating that he had the $300 deposit slip; that Bogad had promised he would make up the arrears, and "I must insist that these payments be caught up." (Bogad testified he did not receive this letter.) Wachter testified he made another trip to the Trailer Court and again insisted that Bogad catch up on his payments. When he received the deposit slip for $300 on February 4th, for the deposit on February 1st, he wrote Bogad on February 6, 1952, stating:

"I have carefully checked the trailer camp account, and find you do not have a penny invested. With what was spent down there since you are there and the rent taken in and what you paid me, you have $1,-500.00 to $2,000.00 over. You are $200.00 behind in my payments and I must insist that this be taken care of right away. I cannot let you collect the rent and put the money in your pocket and give me what you want to. This is not going on forever. I must positively get $400.-00. You are taking in $800.00 rent. See that the $200.00 gets in the bank immediately."

Bogad testified he received this letter. Wachter testified he went to the Trailer Court after writing said letter and told Bogad that Rauhaut said he had $1,000 coming and was going to file a lien; that they ought to have a checkup, and Bogad promised to come in. Zeppenfeld testified that on that occasion Wachter told Bogad [613] he was through with him and was going to put Rauhaut in possession, and he also corroborated Wachter's testimony about making trips to the Trailer Court in September, November, December and January.

Bogad brought his records to Wachter's office on the Saturday after Wachter and Zeppenfeld were at the Trailer Court in February, 1952. Wachter checked Bogad's records and considered them not correct. He told Bogad he had broken his contract and to stay away from the Trailer Court; that he was putting Rauhaut in charge. Bogad testified that Wachter told him if he paid the $700 he could go back; that he told Wachter he would go to the Trailer Court, collect the rents, and pay him the $700, but Wachter said: "No, you don't collect no more." When Bogad returned to the Trailer Court two days later he found Rauhaut had taken possession.

Neither Bogad nor Wachter definitely established the date when Wachter and Zeppenfeld came to the Trailer Court in February, 1952. Bogad testified it was two days after he received the letter of February 6th; that he could not say for sure what date it was. Wachter testified that he did not know what day this occurred; that it wasn't long after the letter of February 6th, it was before or the middle of February; that Rauhaut went into possession the middle, or "somewhere around there" of February; that Bogad "was out" "the middle or latter part of February"; that he could not say whether Rauhaut took possession before February 20th. Witness Zeppenfeld testified the trip to the Trailer Court with Wachter was on a holiday, George Washington's birthday, Friday, February 22, 1952.

Wachter testified that plaintiffs sought the $3,500 loan to improve the Trailer Court; that he told Bogad the water pipes had to be lowered; that Bogad started work on the Trailer Court in a week or ten days after he took possession; that he knew they were lowering the water pipes and enclosing the pump house; that he knew about the sewer work being necessary; that Bogad told him and the work was being done; and that Bogad's records showed expenditures of $1,276.-48 for material and $1,299.31 for labor, a total of $2,575.79.

Bogad testified that he expended approximately $3,400 in improving the property; that his records tended to show expenditures of $2,931.-28 on improvements; that he considered the property his and did not keep a record of all the expenditures; and that Wachter made trips to the Trailer Court "to see that I done the work right."

■ The case is here de novo. Due deference is to be accorded the findings of the chancellor on conflicting evidence. Jones v. Linder, Mo., 247 S. W. 2d 817, 819[2]. However, there is little dispute on the essential facts and our duty embraces the weighing of the evidence and the making of findings upon a review of the record before us.

■ Defendants say, citing the authorities noted, that waiver is a voluntary and intentional relinquishment or abandonment of a known existing legal right (67 C. J. 289, § 1, 302, § 6), and that the burden of proof was upon plaintiffs (67 C. J. 309, § 11). Forfeitures are not favored in equity; and it is not our understanding that proof of waiver of a forfeiture must be so clear etc., as to leave no room or rea-

sonable ground for hesitancy on the part of the chancellor, as contended by defendants, citing Forrester v. Scoville, 51 Mo. 208. See Missouri cases infra; 67 C. J. 309, § 11, n. 59, § 12, n. 67; Annotation, 107 A. L. R. 353(b).

The cases sustain the statement in the Annotation at 107 A. L. R. 347(II,a), that although the decisions usually deal with the problem presented in terms of "waiver," "it is apparent that the elements present in the ordinary case are more nearly those of estoppel. Usually, where it is held that a right of forfeiture has been 'waived,' the vendee has, by the vendor's conduct, been lulled into a sense of security which would render inequitable a sudden assertion of forfeiture. * * So, from the decisions may be drawn a general principle [614] to the effect that when a vendor deals with his vendee in a manner that, or assents to such a course of action with reference to the contract as shows that, notwithstanding any existing default in payment, he regards the vendee's rights under the contract as fully subsisting, he cannot suddenly, and without warning, declare a forfeiture, or maintain that one has automatically occurred."

Our cases are in accord. We have said:

" 'In equity time is not ordinarily regarded as of the essence of contracts, and this is especially true as regards executory contracts for the sale of land which are considered in equity as vesting the equitable title in the purchaser subject to the claim of the vendor for the purchase money.' [Citing authority.] Even when time is of the essence of the contract the vendor may waive the condition or requirement in that respect and he does so by receiving payments after a default. [Citing authority.] Forfeitures are not favored and if the contract does not provide for it or if time is of the essence but has been waived it is necessary that the vendor give the vendee notice of his intention to forfeit the contract before the vendee may be deprived of equitable relief against the forfeiture. [Citing authority]." Branch v. Lee, Mo., 159 S. W. 2d 677, 679[3, 4].

"A default may be waived by acts recognizing the contract as existing, such as * * by permitting the purchaser to expend money in reliance on the contract." Regers v. Gruber, 351 Mo. 1033, 174 S. W. 2d 830, 831[1, 2]. See also Rayburn v. Atkinson, Mo., 206 S. W. 2d 512, 516; Parkhurst v. Lebanon Pub. Co., 356 Mo. 934, 204 S. W. 2d 241, 247; Chapman v. Breeze, 355 Mo. 873, 198 S. W. 2d 717, 721[11]; Kyner v. Bryant, 353 Mo. 1212, 187 S. W. 2d 202, 206.

Under the instant contract the vendees had a grace period of 30 days after the payment due dates before the contract could be declared null and void and the payments forfeited. The vendors accepted the $400 payments of the vendees due September 20th and October 20th, 1951, ten or more days after their respective due dates. These payments were made within the grace period. On December 5, 1951, the vendors accepted a $300 payment on the $400 due November 20,

1951. The vendees had under the contract provisions until December 20, 1951, to pay the $100 balance before the forfeiture clause applied. Notwithstanding the default existing between December 20th and January 7th, the vendors accepted another $300 payment on January 7, 1952, and the vendees' default ceased to exist. The vendees were in default on the $200 balance between January 19, 1952, and February 1, 1952, when they made another $300 payment, which the vendors again accepted, and again reinstated the 30-day grace provisions. Then some time in February, 1952, either before the expiration of the grace period or on February 23, 1952, the vendors, under the circumstances narrated, dispossessed the vendees and put another in possession of the property.

In addition to the acceptance of payments out of time and of lesser amounts than due, the case involves improvements made by the vendees with the vendors' knowledge and consent. We do not have the usual situation with respect to improvements by a vendee under a contract of purchase. Consult Annotation, Ann. Cas. 1917C 89. Here the vendors knew prior to the execution of the contract that the vendees were borrowing $3,500 on their home for the purpose of improving the property the vendors contracted to sell to them. Vendors and vendees contemplated the lowering of the water pipes at the time of contracting. The improvement of the sewer was essential to the operation of the property. The vendors knew of the necessity for the improvements. The improvements were of a permanent nature and in furtherance of the use to which the vendors had devoted the property. According to the vendors the vendees produced records indicating expenditures totaling $2,575.79 over the period involved. The improvements made by the vendees were several [615] times the amount due the vendors when the vendees were dispossessed. Wachter forbid Bogad collecting rents which Bogad claimed were due. The vendors' actions appear oppressive and with a view to securing an unfair advantage under the letter of the contract. The record establishes that the vendees signed a contract prepared and placed before them by Wachter. It also indicates they did not fully understand the terms of the contract. The equities of the vendees, giving consideration to the improvements, should affect the consciences of the vendors. Under the vendors' testimony, the vendees were dunned for payment orally and by letter. "This is not going on forever" in the letter of February 6, 1952 may have constituted a threat to dispossess, but it also was an acknowledgment by the vendors of the acceptance of payments out of time and for lesser amounts and the letter did not invoke the forfeiture provisions of the contract. Said letter recognizes a $200 balance to be due, but defendants' insistence therein that it be paid was premature under the forfeiture clause of the contract as the grace period had not expired. If the forfeiture clause was still in effect on February 20th, only $300 was in default, and not until March 21, 1952, would the $400 due

February 20th be in default. A demand for $700 was not within the forfeiture provisions. A declaration of forfeiture and dispossession of the vendees after said letter and prior to February 20, 1952 (the testimony of Wachter as well as that of Bogad would support such a finding), was premature and not authorized by the contract. If the dispossession occurred on the 23rd of February, 1952, then we hold the vendors by their actions in permitting the vendees to proceed with the improvements while accepting payments out of time and for lesser amounts constituted a waiver to so act on said date in the circumstances of record.

The decree was for the wrong party and is, therefore, reversed and the cause remanded with directions to take an account of the rents and profits after the wrongful dispossession of the plaintiffs and of the payments due defendants and, upon ascertaining the equities between the parties, enter a decree granting plaintiffs specific performance of the contract, conditioned upon such performance by plaintiffs as the facts establish to be equitable and just. *Barrett* and *Stockard, CC.*, concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.

## ON MOTION FOR REHEARING

PER CURIAM:—Defendants, in their motion for rehearing, contend our statement of facts in this equity suit gives credence to incredible testimony of plaintiff Bogad, failed to give due consideration to the testimony of defendant Wachter, and that we reached an erroneous result.

Defendants say the transcript does not show that "Bogad testified * * that Wachter informed him * * that the wooden sewer would hold for 10 or 15 years, and that a septic tank was not needed." (Op. ¶ 5.) The sewer was a wooden sewer with no septic tank; and defendants have inadvertently overlooked Bogad's testimony that Wachter told him "the idea was to put the sewer in and sheeting board, and the sewer would hold 10 or 15 years and you never need a septic tank." (Tr. 31, 34, 73, 74.)

Defendants question the statement: "Bogad informed Wachter he would purchase if he could raise $3,500 by an additional loan on his home." (Op. ¶ 5). Bogad, on cross-examination, so testified. (Tr. 76.) At that time the Bogad home was security for a balance of $5,357.25 on a loan. Wachter testified: "He [meaning Bogad] suggested that if I would increase the loan to $3,500.00, he would come down [616] here and spend it in improvements and put up some cottages." (Tr. 237.) The checks connected with the $3,500 loan are dated: $500, August 24, 1951, an advancement, and for the balance, August 31, 1951.

Next defendants take exception to the statements (emphasized here) in the paragraph beginning: "Mr. Bogad is plaintiffs' only

witness on the issue of waiver. *It is true as defendants state that Bogad's testimony is confusing and contradictory in places; but certain essential facts are not disputed."* Defendants say they stated Bogad's testimony was "conflicting, contradictory, unreasonable, unbelievable and incredible." We are unable to follow defendants in their claim that Bogad's testimony was unreasonable, unbelievable and incredible. Wachter's testimony corroborated Bogad on some material facts. We remain of the opinion that on the issue of waiver, the issue tried, certain essential facts are not disputed. Bogad borrowed $3,500 to make improvements at the Trailer Court, not to pay the $400 monthly installments. Defendant Wachter knew this and knew that improvements were being made. He accepted payments of the installments after their due date and also partial installments after the due date and after the forfeiture date under the contract terms. It is not determinative on the issue of waiver whether Bogad deposited his payments in the Waynesville bank or took the bank deposit slips to Wachter's office for Wachter to enter the credits in Bogad's receipt book. Defendants say, without reference to transcript pages, the improvements took place in August, September and October, 1951, and also that they had been completed by November 20, 1951. If it is so established of record, we have inadvertently overlooked it. The date when the improvements were completed within the six months involved is not determinative. The material fact is that Bogad did make improvements of a permanent nature and defendants, under the record, are enriched thereby. Wachter testified that the records Bogad brought to his office in February, 1952, showed total expenditures of $2,575.79; and Wachter's complaint at the time was that Bogad was collecting enough rents to timely pay the $400 monthly installments but did not do so, as Wachter testified: "I said: 'You are not fooling me, you got that rent' "; "I told him he had broken his contract, and that I was putting Rauhaut in charge."

Defendants' complaints do not call for a change in the result. The foregoing are illustrative thereof.

With defendants waiving and thereafter suddenly without reasonable notice asserting a forfeiture and arbitrarily and wrongfully ousting Bogad and taking possession of the Trailer Court without recognition of any rights that existed or might exist in Bogad, Bogad's plea of being ready, able and willing to perform and offering and tendering compliance with such orders as the court might make as a condition to equitable relief, was a submission to the jurisdiction and orders of the court and a sufficient offer of performance in the unusual circumstances of record. Kyner v. Bryant, 353 Mo. 1212, 187 S. W. 2d 202, 206[5, 6], mentioned in the opinion; Deichmann v. Deichmann, 49 Mo. 107; Cape Girardeau-Jackson I. R. Co. v. Light & D. Co., 277 Mo. 579, 210 S. W. 361, 372(II).

The motion for rehearing is overruled.