PLYMOUTH SECURITIES COMPANY, a Trust, T. R. Ayars, Individually and as Trustee of The Plymouth Securities Company, a Trust,

Walter E. Harral, by Edith D. Harral, Charles Seewoster, and Byron W. Moser, Joint Executors of the Estate of Walter E. Harral, Deceased,

O. B. Bottorff, and Ethel D. Bridell, Appellants,

v.

Ray L. JOHNSON, Robert W. Maysack, and Laurel Hills Memorial Gardens, Inc., a Corporation, Respondents.

No. 47295.

Supreme Court of Missouri,

Division No. 2.

April 11, 1960.

Motion for Rehearing or for Transfer to Court en Banc Denied May 9, 1960.

# 144

Lester F. Stephens, St. Louis, for appellants.

Ward Fickie, Biggs, Hensley, Curtis & Biggs, St. Louis, for Ray L. Johnson and Laurel Hill Memorial Gardens, Inc.

Henry C. Hughes, St. Louis, for Robert W. Maysack.

STORCKMAN, Judge.

This is an action in equity in two counts tried by the court sitting without a jury. The first count sought the removal of the defendants Ray L. Johnson and Robert W. Maysack as trustees of the plaintiff Plymouth Securities Company, a common law trust. The general object of the second count was to declare a default by defendants in the performance of their obligations under a contract whereby Plymouth agreed to sell and convey to the defendants the property in St. Louis County, known as the Laurel Hills Cemetery, and to eject the defendants and revest the plaintiffs with possession of the property free of any claims of the defendants. In general, the court found that any defaults by defendants had been waived and decreed that the plaintiffs convey the property pursuant to the contract upon payment of the remainder of the purchase price found by the court to be due. The defendants chose to abide by the judgment, but the plaintiffs have appealed.

■ Regardless of other considerations, the amount in dispute on October 14, 1958,

when the appeal was taken, gives this court jurisdiction. Constitution of Missouri, 1945, Art. V, § 3, V.A.M.S. Plaintiffs were refused the possession of land shown to have a reasonable market value in excess of $300,000 and the trial court ordered the land conveyed by plaintiffs to defendant Laurel Hills Memorial Gardens, Inc., upon payment of $100,705.66, which the defendants were willing to do. The plaintiffs further contend that, even though the decree of the trial court is affirmed, they are entitled to an additional amount of at least $11,000 as interest and penalties not allowed by the trial court.

The common law or business trust designated Plymouth Securities Company was organized July 23, 1923. The Declaration of Trust was executed by Dr. Walter E. Harral and two others who were the original trustees. The principal asset of the trust was approximately 180 acres of land in St. Louis County which the trustees were authorized to subdivide into lots and improve "for residences, business, cemetary, park or other purposes". The trust instrument further provided: "The Trustees shall issue certificates of beneficial interest in the trust estate for 4,000 shares of the par value of $100.00 each or multiples thereof, to persons contributing to the trust estate in proportion to their contributions respectively." In case of a vacancy on the board, the remaining trustees were authorized to select a successor. The plaintiff Dr. T. R. Ayars became a trustee on May 20, 1925, having been selected to fill a vacancy caused by the resignation of one of the original trustees. The land was developed as a cemetery known as Laurel Hills Cemetery. At the time the defendants Johnson and Maysack came onto the scene, the trustees appeared to be Dr. Harral, Dr. Ayars and Mr. O. B. Bottorff.

In December 1945 these three as trustees of Plymouth Securities, designated as Seller, executed an agreement for the sale of all of the assets of the Seller to the defendants Maysack and Johnson, as Pur-

chasers, for the sum of $225,000 and the assumption by the Purchasers of all of the Seller's liabilities. By the terms of the contract, the Purchasers agreed to organize and establish a sales agency and sell or cause to be sold grave lots, crypts and niches having a minimum gross sales price per calendar year as follows: $100,000 for each of the years 1946 and 1947; $150,000 for each of the years 1948, 1949 and 1950; $200,000 for each year thereafter until the purchase price of the assets was paid in full. (Apparently no mausoleum was constructed and we are concerned only with sales of lots.) Sales of lots in excess of the minimum for any year could be applied by the Purchasers to the sales quota of the next succeeding year. The Purchasers were authorized to sell lots for cash or on an installment basis. Purchasers agreed to furnish on or before the 10th day of each month a statement showing all lots sold during the preceding month.

In payment of the purchase price of $225,000 Purchasers agreed to set aside and pay to the Seller an amount equal to 10 per cent of the gross sales price of all lots sold. Such payments were to be made to the Seller "on or before the 15th day of each month for all lots, on which deeds have been delivered during the calendar month next preceding." In the event of a failure to meet the minimum quota of sales in any year, the Purchasers were allowed a grace period of six months immediately following the close of the year in which the default occurred, during which time the Purchasers were required to "make all payments and quotas current," and the Purchasers were further required to "pay to Seller an additional five (5%) percent of the amount due on the portion of the contract quota for which Purchaser is in default at the end of any such year."

The Purchasers agreed that they would carry out and fully perform all duties and obligations of the Seller under a contract dated July 23, 1923, with the Laurel Hills Cemetery Association for the perpetual care of the cemetery, whereby Plymouth had agreed to set aside and pay to the Perpetual Care Fund of the Association 10 per cent of the sale price of each cemetery lot and, if the income from the Perpetual Care Fund should be found to be inadequate for proper maintenance and care of the cemetery, the Purchasers further agreed that they would supply from their own funds any additional amount necessary. The Purchasers also agreed to set aside and expend for improvement, developments and maintenance of Laurel Hills Cemetery 15 per cent of the gross sales price of all lots sold by them.

The Purchase Agreement provided that the legal and record title of all assets should remain vested in the Seller until the purchase price of $225,000 was paid in full and until the contract was fully performed by the Purchasers. The Seller agreed to execute all necessary conveyances and documents when the contract was fully performed and, pending final conveyance, the Seller agreed to execute and deliver, upon demand of the Purchasers, deeds to lots sold and paid for in full. Article VI will be more fully developed later. However, it provided in general that the Seller could cancel the contract if the Purchasers failed to comply with all of its terms and that the Purchasers should have a six months' grace period to cure a default in payment, but in the event of cancellation all the property and improvements should revert to the Seller as liquidated damages.

The Purchasers were granted the right to change the name of the cemetery to Laurel Hills Memorial Gardens. They were also authorized to assign the contract to a corporation in which Johnson and Maysack would be active officers and control the voting power of the corporation. Pursuant to such authority, the Purchasers changed the name of the cemetery and formed a corporation known as Laurel Hills Memorial Gardens, Inc.

On November 13, 1953, lot owners, who were members of Laurel Hills Cemetery

Association, filed suit in the Circuit Court of St. Louis County against Johnson, Maysack, Laurel Hills Memorial Gardens, Inc., Laurel Hills Cemetery Association, and Plymouth Securities Company, seeking an accounting and a determination of their rights and interest in the Perpetual Care Fund, the payment of such fund to the county clerk, and the appointment of a receiver and an injunction against the defendants. On trial of the case, the court dismissed the petition and the plaintiffs appealed to the supreme court and the cause was transferred to the St. Louis Court of Appeals because of lack of jurisdiction. See Powers v. Johnson, Mo., 302 S.W.2d 899. The Court of Appeals found that Johnson and Maysack, as trustees of the Association, had improperly invested trust funds, had commingled funds of the Corporation and the Association, and that they should be removed as trustees of the Association because the duties conflicted with their office as directors of the Corporation. The finding was against the plaintiffs on all other issues, including an accounting and the correctness of the amount of the Perpetual Care Fund. See Powers v. Johnson, Mo.App., 306 S.W.2d 616, decided November 5, 1957.

A letter dated December 28, 1953, signed by Harral, Ayars and Bottorff, as trustees, and addressed to Maysack and Johnson, purported to cancel the rights of the Purchasers for failure to meet the annual minimum quota of sales. In January 1954 the defendants replied that while they had not "lived up to the letter of the contract in regard to gross sales," they had done other things not provided for which should be taken into consideration. No further action was taken and the Purchasers remained in possession and continued to make payments under the contract.

Dr. Harral, who apparently had been chiefly interested in organizing and managing the cemetery, died January 4, 1956. Under date of February 18, 1957, the plaintiff T. R. Ayars, as vice-president of Plymouth Securities Company, notified the de-

fendants that there had been "a failure on the part of the Purchasers to comply with all the terms" of the Purchase Agreement of December 27, 1945, and that "the Seller will, after sixty (60) days from the date hereof, cancel all rights of the Purchasers under the aforementioned agreement for Purchasers' failure to comply with the agreement."

This suit was filed on December 11, 1957. The defendants, among other things, pleaded that the plaintiffs as a class had received benefits under the contract of December 1945 in excess of $175,000; that plaintiffs had not tendered a return of the benefits received; that after the purported cancellation of the contract on April 20, 1957, the defendants had made several payments under the terms of the contract which the plaintiffs had accepted and retained and therefore the plaintiffs were not entitled to the relief requested.

The trial court appointed M. B. Barken, a certified public accountant, to make an audit of the payments made to plaintiffs on account of the purchase price of $225,000. The audit, defendants' Exhibit 14, showed total payments on the purchase price of $124,294.34, leaving a balance due of $100,705.66. Charles Seewoster, one of the executors of Dr. Harral's estate and by occupation a real estate and insurance broker, but not a certified public accountant, undertook, as a witness on behalf of the plaintiffs, to analyze and interpret various financial records and exhibits in evidence. Mr. Seewoster testified that as far as he knew the balance due of $100,705.66, shown by the Barken Report, was correct. The plaintiffs offered no evidence to the contrary.

When the defendants took possession and began operation of the cemetery under the December 1945 contract, Dr. Harral, Dr. Ayars and Mr. Bottorff had advanced a combined total of $92,586.35 for improvement and maintenance of the cemetery property. The Purchasers by a supplementary contract dated January 16, 1946, Exhibit F, agreed to pay this unsecured loan

prior to making payments to the certificate holders generally. According to the Barken Report and other evidence, the indebtedness so assumed was completely paid by the Purchasers on July 10, 1954. By July 15, 1957, $27,200 had been paid to certificate holders generally and $4,507.99 on account of other charges such as Seller's income taxes. When the defendants took over at the end of December 1945, the land was encumbered by a deed of trust for $70,000. This deed of trust was released and another deed of trust dated November 15, 1947, was recorded November 25, 1947. The latter deed of trust secured notes in the sum of $94,000 held by Dr. Harral and Dr. Ayars. These secured notes had been paid down to a balance of $17,500 at the time of the trial, but the payments so made were not a credit on the purchase price. In 1950 about thirty acres of the land was sold with the consent of all concerned and a portion of the proceeds of the sale was applied to the balance due under the contract of December 1945. The evidence tended to show that the land remaining had a reasonable market value in excess of $300,000. Other evidence will be discussed in the course of the opinion.

On July 24, 1958, the court entered its findings of fact, conclusions of law, judgment, order and decree as follows:

"This cause having heretofore come on to be heard upon the plaintiffs' amended petition and answer, and upon defendants' motion to dismiss, it being stipulated between the parties that all matters in controversy would be submitted at the same hearing, and the evidence having been heard and taken under advisement by the Court, and the Court, being fully advised of and concerning the premises, does make and enter the following findings of fact, conclusions of law, judgment, order and decree:

"1. Plaintiffs Ayars, Bridell, Estate of Walter Harral by the Co-Executors and Bottorff constitute a large majority of the holders of certificates of beneficial interest of Plymouth Securities Company, a Trust; and they fairly and adequately represent the other members of the Class. The individual holdings of the 4,000 shares of beneficial interest of Plymouth Securities Company as shown by Exh. L are:

| | | | | |
|---|---|---|---|---|
| Dr. Walter Harrall | 2064–½, | | E & F. Schaefer | 1, |
| Dr. T. R. Ayars | 937, | | Harry L. Yawitz | 18, |
| O. B. Bottorff | 568–½, | | Thomas Snyder | 5, |
| Ethel D. Bridel | 18, | | Frank Alhoff | 5, |
| Mrs. Fred Robinson | 150, | | Dr. W. F. O'Malley | 24, |
| J. F. Newman | 9, | | Arthur A. Guenther | 200. |

"2. Plymouth Securities Company, a Trust, is a common law trust established for business purposes.

"3. Plymouth Securities Company sold all its assets to Robert W. Maysack and Ray L. Johnson under the terms of a contract (Exh. E.) executed on or about December 31, 1945 providing for the payment of the consideration over a period of years. The consideration to be paid was the assumption by the defendants of certain obligations of Plymouth Securities Company plus the payment of $225,000.00 in installments.

"4. Robert W. Maysack and Ray L. Johnson were elected Trustees of Plymouth Securities Company on or about December 18, 1945 (Defts. Exh. 1 and 11) and have continued as Trustees to this time.

"5. Robert W. Maysack and Ray L. Johnson assigned their interests in the said contract to Laurel Hill Memorial Gardens, Inc. by an instrument of April 15, 1946 (Exh. E–1.).

"6. Defendants have paid plaintiffs the sum of $124,294.34 on the original $225,000.00 purchase price provided by Exh. E.

"7. Defendants, under the terms of the above-mentioned contract, assumed an obligation of Plymouth Securities Company of approximately $70,000.00 secured by a deed of trust held by plaintiffs Harral and Ayars, which deed of trust was later replaced by a new deed of trust and a new obligation of $94,000.00.

"8. The present principal balance owing on the existing deed of trust obligation is $17,500.00.

"9. Defendants have made regular quarterly payments under the contract (excepting July, 1948 and October, 1956) to the certificate holders of Plymouth Securities Company through July, 1957.

"10. T. R. Ayars as Trustee of Plymouth Securities Company, sent a letter dated February 18, 1957 (Exh. G) to Robert W. Maysack, Ray L. Johnson and Laurel Hills Memorial Gardens, Inc. stating generally that the contract was in default and would be cancelled in 60 days under the contract provision VI (Exh. E.).

"11. Plaintiffs Ayars, Estate of Walter E. Harral, Bridell and Bottorff as well as holders Guenther, Yawitz, Robinson, O'Malley and Allhoff (representing 3,985 of the 4,000 shares) accepted payments under the terms of the contract subsequent to the February 18, 1957 letter.

"12. Defendants have offered to pay plaintiffs the balance due under the terms of the purchase contract.

"13. Plaintiffs participated in the election of Robert W. Maysack and Ray L. Johnson and acquiesced in their continuing to act as Trustees and are estopped to raise the question of qualification at this time.

"14. Plaintiffs have failed to meet their burden of proving that defendants were in default under the terms of the contract of December 31, 1945 at the time of the filing of this proceeding.

"15. The defaults, if any, that may have existed under the terms of the contract (Exh. E) were waived by acceptance of payments under the terms of the contract (Exh. E) and the subsequent agreement of Jan. 15, 1946 (Exh. F.).

"16. The uncontroverted evidence shows plaintiffs have received $124,294.34 on acount of the $225,000.00 to be paid under the terms of the contract, and in addition at least $70,000.00 has been paid by the defendants on obligations of Plymouth Securities Company assumed by the defendants under the terms of said contract.

"17. This cause is before this Court sitting as a Court of Equity and it would be an unconscionable act to hold that plaintiffs are now entitled to re-enter and resume possession of the basic asset which was purchased, a cemetery consisting of approximately 130 acres of land, and thereby destroyed defendants' equity in the land. Defendants' offer to pay the remaining balance due on the contract makes it unthinkable for a Court of Equity to do other than order plaintiffs to accept the balance due and to specifically perform their obligations under the contract.

"It Is Therefore, Ordered, Adjudged And Decreed:

"(1) Plaintiffs' first cause of action is herewith dismissed with prejudice.

"(2) Plaintiffs' second cause of action is herewith dismissed with prejudice.

"(3) Defendants are ordered to pay the holders of certificates of beneficial interest of Plymouth Securities Company, in proportion to their interests, the sum of $100,705.66. Such sum to be paid within ten (10) days after this order becomes final. Concurrently with the payment of the above sum the plaintiffs are ordered to carry out their obligations under the contract (Exh. E.) to the end that all necessary deeds of conveyance, bills of sale and other documents necessary to place and vest title to all of the property purchased under the terms of the contract shall be

executed by Plymouth Securities Company and delivered to defendant Laurel Hill Memorial Gardens, Inc. Upon receipt of payment of the above sum and upon execution of the aforementioned deeds of conveyance, bills of sale, etc., plaintiffs Ayars, Bottorff and the Estate of Walter E. Harral by its co-executors are ordered to effect delivery of the shares of beneficial interest held in escrow in Boatmen's National Bank under the agreement (Exh. H.).

"(4) Plaintiffs Ayars and the Estate of Walter E. Harral by its Co-executors are herewith restrained [until further order of this Court] [1] from taking any action to foreclose under the provisions of the deed of trust (Exh. B–1).

"(5) Jurisdiction is retained by this Court to enter such further orders, if any, that may become necessary.

"(6) The cost of the audit report prepared by Mr. M. B. Barken (Exh. L) shall be borne equally by the plaintiffs and the defendants; and all other court costs shall be borne by the plaintiffs."

Plaintiffs assert that Johnson and Maysack were elected trustees of Plymouth contrary to provisions of the by-laws which require a trustee to be an owner of a certificate of beneficial interest and, if they were qualified as trustees, they should be removed for misconduct. Also they contend that the Purchase Contract was void from the beginning because Johnson and Maysack contracted for the purchase of the assets of Plymouth in violation of the trust instrument which provides that a trustee may purchase at public auction any real or personal property offered for sale by the trustees.

■■ The plaintiffs rely upon the concept of the duties of trustees generally as set out in 90 C.J.S. Trusts §§ 246, 247 and 248, and other standard works. In 2 Bogert, Trusts and Trustees, § 291 at page 359, this distinction is made: "The most significant characteristic of the business trust, and the most important distinction between such trusts and ordinary trusts established by will or inter vivos, lies in the fact that the business trust is organized, not as a means of effecting a gift or transfer, but as a device for profit-making through the combination of capital contributed by a number of investors. In ordinary trusts the settlor is seldom also the sole or principal beneficiary; in business trusts such is almost invariably the case— the trust res consists of property originally contributed by the beneficiaries themselves." See also 12 C.J.S. Business Trusts § 1, p. 811, and § 23, p. 834. In Beedle v. Campbell, 8 Cir., 100 F.2d 798, 801, which also involved the ownership and operation of a cemetery by a business trust, the court held that the trustees occupied a fiduciary relationship to the beneficiaries of the trust, but further stated: "In the instant case, the trustees were likewise beneficiaries, and the relationship gave rise to duties and responsibilities similar to that of partners." In United Cemeteries Co. v. Strother, 332 Mo. 971, 61 S.W.2d 907, 90 A.L.R. 438, this court recognized that in Missouri cemeteries may be owned and managed by individuals or corporations for profit.

Plaintiffs' Exhibit C, a written instrument dated June 6, 1950, and recorded June 7, 1950, signed by Harral, Ayars, Johnson and Maysack as trustees of Plymouth, recites that at a meeting of the holders of beneficial interest of Plymouth held on December 18, 1945, the Declaration of Trust was amended to provide for four trustees instead of three, and that Johnson and Maysack were elected to fill vacancies and they with Dr. Harral and Dr. Ayars then constituted the board of four trustees. From Exhibit F, dated January 15, 1946, it appears that Harral, Ayars and Bottorff agreed to transfer to Johnson and Maysack

1. Words in brackets added as amendment by the trial court on its own motion prior

to overruling plaintiffs' motion for new trial.

all their certificates of beneficial interest, and Exhibit H, an escrow receipt dated June 12, 1946, shows the deposit with the escrow agent Certificate No. 4 for 3570 shares of beneficial interest issued in the names of Maysack and Johnson. Plaintiffs' own evidence shows that Johnson and Maysack were at least record owners of certificates of beneficial interest. It further appears that they were made trustees as a part of the plan of purchase in aid of their performance of the duties of management and operation of the cemetery which they were assuming. The Purchase Contract did not result from their being trustees.

█ Doctors Harral and Ayars and Mr. Bottorff, the trustees in December 1945, owned in the aggregate 3570 shares of beneficial interest out of a total of 4000 issued. The records disclose that they, as owners of almost 90 per cent of the trust, had previously operated the business with little reference to the owners of the other 10 per cent, the whereabouts of three of whom had not been known for years. Further, the trust instrument empowered the trustees, with the assent in writing of two-thirds in interest of the certificate holders, to amend the Declaration of Trust. The evidence shows that all of the beneficiaries, with the possible exception of the three whose addresses are now unknown, knew of the Purchase Contract and accepted benefits under it. If they ever had a valid complaint in the respect asserted, they voluntarily relinquished and waived it. The plaintiffs now have no standing to say that Johnson and Maysack were disqualified as trustees or that the Purchase Contract was void.

█ Plaintiffs contend the court erred in refusing to declare a cancellation of the Purchase Contract and eject the defendants from the premises for failure of defendants to comply with all the terms of the contract as provided by Article VI. The plaintiffs urge that the Purchase Contract was breached in these particulars. The defendants (1) failed to comply with the minimum sales quotas in the years 1953, 1955 and 1956; (2) failed to pay to the Seller regularly each month 10 per cent of the sales price of all lots to which deeds were delivered during the preceding month; (3) failed to set aside in a separate account and pay regularly to the Laurel Hills Cemetery Association 10 per cent of the money received from the sale of grave lots; (4) failed to set aside and use 15 per cent of gross sales volume income for the improvement, development and maintenance of the cemetery; (5) failed to furnish plaintiff with monthly statements showing the lots sold the preceding month as required by Article VII of the contract; (6) sold stock control of the Laurel Hill Memorial Gardens, Inc., to third persons contrary to Article IX of the contract which provides that the contract may be assigned by Maysack and Johnson "to a Corporation to be formed by them in which they will both be active officers and control the voting power of said Corporation"; and (7) failed to pay to T. R. Ayars and Walter Harral the balance of $17,500 due on notes secured by a deed of trust on the land owned by the Seller.

The exhibits are numerous and the record voluminous, but it is unnecessary to discuss in detail the evidence on each of these issues. The documentary evidence consisted of various contracts, financial statements and business records, but the conclusions drawn therefrom are not always reliable or helpful. On the fact issues stated, it may be said in general that while the Seller gave a notice of cancellation in December 1953, it appears from a computation, Exhibit K, made by Mr. Seewoster that there was not a deficiency in the cumulated total sales until 1955. In some of the early years, sales were far in excess of the quota. There was some testimony that publicity in connection with the litigation commenced in November 1953 involving the Perpetual Care Fund had a harmful effect on sales. On the other hand, there was evidence that the business had been neglected in recent years due to the ill-health and in-

temperance of one of the defendants and extended absences of the other. Although the contract provided for a monthly payment on the purchase price, the payments were made quarterly, apparently by mutual consent. While a minimum annual dollar volume of sales was required, the payments on the $225,000 purchase price was based on sales completed and deeds delivered. Thus payment to the Seller would be deferred in case of installment sales and presumably eliminated entirely where the lot buyer defaulted and abandoned his contract.

Plaintiffs undertook to prove a shortage in the Perpetual Care Fund payable to Laurel Hills Cemetery Association. The court ruled that such issue was res judicata for the time prior to July 1954 because of the decisions in Powers v. Johnson, supra, an action brought by members of the Association against Plymouth Securities Company and the Purchasers in which the correctness of the amount paid into the Care Fund was an issue. The plaintiffs have failed to show that the ruling of the trial court was erroneous. Further plaintiffs' evidence is too indefinite to establish any deficiency since 1954. The Association is not a party to the action and the plaintiffs do not establish their right or duty to litigate the issue on behalf of the Cemetery Association.

The evidence that the defendants did not spend at least 15 per cent of the amount of the gross sales of lots on the maintenance and improvement of the cemetery is not convincing. While such amount may not have been set aside in a fund as expressed in the contract, the records of the Memorial Gardens Company may be fairly interpreted to prove that more than the required amount was spent. This provision seems intended to maintain the value of plaintiffs' security and would not extend beyond the complete performance of the contract.

At the trial a contract was disclosed whereby the defendants have sold or expect to sell their stock interest in Memorial Gardens Company to Pennsylvania Avenue Cemetery Company in which they will have no control or voting rights. The contract was not put in evidence. Johnson and Maysack had the right to form a corporation as they did, and it cannot be expected that they would be forever barred from disposing of their holdings. This too could not in any event survive the complete performance of the Purchase Agreement.

The notes secured by a deed of trust on the land were paid until the litigation began and all parties being before the court foreclosure was enjoined until the further order of the court. If the Estate of Dr. Harral and Dr. Ayars, the note holders, were permitted to foreclose, it would be against the interest of the other beneficiaries of the trust of which Dr. Ayars is and Dr. Harral was a trustee as well as against the interest of the Purchasers. This seems to fall in the same category with other payments required to be made as a part of the purchase price of the assets of the Seller.

That Purchasers failed to maintain their minimum sales quota in 1955 and thereafter seems unquestioned. It follows that there must also be a deficiency in the purchase price payments contemplated by the contract of the parties, but proof of the exact amount is unsatisfactory due in large measure to the fact that the contract does not establish minimum annual payments, only minimum sales volume. Nevertheless the certificate holders have accepted payments since October 1954 when they knew or could have known that the sales quotas and hence the purchase price payments were in arrears. After notice of cancellation of the Purchase Contract was given on February 18, 1957, the defendants made two payments under the contract on account of the purchase price. One was on April 15 and the other on July 15, 1957. All of the beneficiaries received and retained these payments, except the three whose addresses were unknown. All of the certificate holders who testified knew of the contract to sell the assets, and the source of the pay-

ments made to them is apparent on the face of the checks.

■ Even when time is of the essence of a contract for the sale of real property, the seller may waive the condition and does so by receiving payments after default. Bogad v. Wachter, 365 Mo. 426, 283 S.W. 2d 609, 614 [5]; Branch v. Lee, Mo., 159 S.W.2d 677, 680 [3]; Frank v. Dodd, Mo. App., 130 S.W.2d 210, 215 [4]; Robberson v. Clark, 173 Mo.App. 301, 158 S.W. 854, 855–856 [1, 2]. The acceptance of payments on account of the purchase price waived default in the time of payment, but it did not extinguish the debt. The plaintiffs contend the Purchase Contract entitles them to cancellation and a return of the cemetery property.

The Purchase Contract, Article I, provides: "The Seller has this date sold to Purchasers, all of the assets of the Seller, * * * for the price and sum of Two Hundred Twenty Five Thousand ($225,-000.00) Dollars, * * *." Article II(a) provides .that payment is to be made from the sale of cemetery lots. The Purchasers agree to pay to Seller a sum equal to 10 per cent of the gross sales price of each lot "upon receipt by them of the purchase price thereof, to be applied by the Sellers on the purchase price * * *, such payments to be made on or before the 15th day of each month for all lots, on which deeds have been delivered during the calendar month next preceding." Article VI provides that the Seller may cancel all rights of the Purchaser under the contract "in event of the failure on the part of Purchasers to comply with all the terms of this contract to be by them performed," and that: "All property and improvements and other assets shall thereupon revert to Seller as compensation or damages for the use of its property and as liquidated damages, and not as a penalty for the breach of this agreement." This is a contract of sale for a definite sum and the balance due has been ascertained. The Purchasers have indicated a willingness and ability to pay it.

■ It is axiomatic that forfeitures are not favored in equity. Bogad v. Wachter, 365 Mo. 426, 283 S.W.2d 609, 613 [2]. Where a contract of sale contains several distinct covenants of various degrees of importance and the damages for breaches would be easy to calculate as to some of them and difficult as to others, the specification of a sum of money or definite property as damages for breach of the contract will be construed as a penalty designed to insure performance, even though the parties have expressly declared the provision to be one for liquidated damages. Wilt v. Waterfield, Mo., 273 S.W.2d 290, 295 [10]; Morse v. Rathburn, 42 Mo. 594, 601. Also if the amount or value of the property stipulated as liquidated damages for breach of contract is greatly disproportionate to the ensuing loss, the court will construe it to be a penalty and restrict the damages recovered to those actually suffered. Abrams v. St. Louis County Library Dist. Board, 364 Mo. 25, 258 S.W.2d 672, 675 [1]; Buchanan v. Louisiana Purchase Exposition Co., 245 Mo. 337, 149 S.W. 26, 29 [4]. Here the plaintiffs have assigned seven particulars in which they claim the contract has been breached, some of minor and some of major importance. The covenants are chiefly ancillary to the promise to pay the purchase price. The present value of the property far exceeds the balance due on the purchase price. In these circumstances the court properly refused to declare a forfeiture.

■ Especially where a sale of land is involved, a failure to pay the purchase price at the time stipulated will not usually work a forfeiture or authorize rescission of the contract since interest on the amount due will ordinarily be sufficient compensation for the delayed payment. Scheerer v. Scheerer, 287 Mo. 92, 229 S.W. 192, 197 [8]; Parkhurst v. Lebanon Publishing Co., 356 Mo. 934, 204 S.W.2d 241, 247 [10].

■ Article II(f) provides that if the Purchasers fail to meet their annual minimum volume of sales they shall have a grace period of six months to "make all

payments and quotas current, and shall, in such event, pay to Seller an additional five (5%) percent of the amount due on the portion of the contract quota for which Purchaser is in default at the end of any such year." Plaintiffs assert they are entitled to an allowance in addition to the principal sum because of this provision. The plaintiffs continued to accept periodic payments after the failure to meet the annual sales quota in earlier years and did not invoke the provision until the time of trial. The provision is rather ambiguous, but during his testimony Dr. Ayars contended that the 5 per cent should be figured on the arrearage in the purchase price payments. He claimed that $8436 was due in interest and that the plaintiffs were entitled to a discount of $3109 because of the balance being paid "before the projected date, which was in 1961." The basis of his computation is not disclosed and we have not been able to arrive at any such result. However, the defendants in open court further amended their motion to dismiss to include an offer to pay in addition to the balance of the purchase price 5 per cent of $43,157.60, which latter sum is 10 per cent of the cumulated deficiency in sales volume on December 31, 1957. Since this item is not otherwise sufficiently established, we accept the defendants' offer as a judicial admission and rule that an additional allowance of $2157.88 should have been made under this provision of the contract.

 The plaintiffs further contend that the court erred in assessing the costs of the action against them as well as one-half of the cost of the Barken Report. This points up a defect in the decree which should be corrected. The trial court ordered the dismissal of both counts of plaintiffs' petition, and defendants' answers did not seek affirmative relief. The defendants' motion to dismiss which at most was an offer of judgment had no vitality independently of the causes of action which the court dismissed. Although a decree would be justified under the evidence, it cannot

stand when no pleading remains in the case to support it. Kemp v. Woods, 363 Mo. 427, 251 S.W.2d 684, 688 [3]; Poole v. Poole, Mo.App., 287 S.W.2d 372, 374 [3]; Owens v. McCleary, Mo.App., 273 S.W. 145, 147 [1]; Orchard v. National Exchange Bank, 121 Mo.App. 338, 98 S.W. 824, 828 [8]; 30 C.J.S. Equity §§ 604 and 605.

While plaintiffs' petition did not specifically ask for a determination of the amount due on the contract, Count 2 did pray, inter alia, that the equity, rights, interests and ownership between the plaintiffs and the defendants affecting the property known as Laurel Hills Cemetery be fully adjudicated and determined, and there was also a prayer for general relief. The Purchasers were delinquent in sales and hence in arrears in payments under the contract at the time suit was filed. While rescission of the Purchase Contract was not in order, the plaintiffs were entitled to other relief. See Bogad v. Wachter, 365 Mo. 426, 283 S.W.2d 609, 616 [6].

 The pleading and proof were sufficient to support the judgment and decree entered. The first count of plaintiffs' petition was properly dismissed, but the second cause of action should not have been. So far as appears from the record, the defendants had made no effort to put themselves in good standing and made the bringing of the action necessary. Since the plaintiffs were entitled to prevail on their second count, the defendants should have been assessed with all the costs of the action, but the cost of the Barken Report should be borne equally by the plaintiffs and defendants. The faulty accounting methods of both parties appear to have made this audit necessary.

Except as above noted, the Findings of Fact, Conclusions of Law, Judgment, Order and Decree entered by the trial court on July 24, 1958, are approved. The judgment and decree dismissing plaintiffs' second cause of action and assessing court costs against the plaintiffs is reversed and the

cause is remanded with directions to enter a new judgment and decree consistent with the views expressed in this opinion.

LEEDY, P. J., EAGER, J., and JAMES W. BROADDUS, Sp. J., concur.