Betty Lou KEY, Plaintiff-Respondent,

v.

Helen O. GREGORY,
Defendant-Appellant.

No. 10191.

Missouri Court of Appeals,
Springfield District.

June 21, 1977.

Max H. Glover, Webb City, for defendant-appellant.

Charles M. Edwards, Myers, Webster & Perry, Webb City, for plaintiff-respondent.

HOGAN, Judge.

Plaintiff Betty Lou Key sought and obtained specific performance of an installment contract for the sale of land.[1] Defendant appeals.

In January 1968 Cecil F. Gregory and Edwin A. Key were osteopathic physicians practicing in Webb City. At some time in January the two physicians and their wives entered into the contract sued upon, which is of the "contract for deed" or "bond for

1. The contract incidentally includes some medical supplies and equipment, but the parties have treated the contract as an agreement for the sale and purchase of real property, and we shall so regard it.

title" variety. By the terms of the agreement, Dr. and Mrs. Gregory were to convey two lots in an unspecified block of Byers and Ball's Addition to Webb City, Missouri, "including the drugs and fixtures therein contained" to "E. A. Key, D.O., and Betty Lou Key, husband and wife."[2] The agreed selling price was $75,000, to be paid as follows: $10,000 at the time of execution of the contract, and the balance at the rate of $1,000 per month until fully paid with interest at the rate of six percent per annum on the unpaid balance. The contract recites that the vendee's debt shall be evidenced by a promissory note in the amount of $65,000.[3]

Other pertinent provisions of the contract were: 1) that the vendees should pay the real property taxes due on the premises for the year 1968 and thereafter; 2) that the vendees "presently occupy said premises together with C. F. Gregory, D.O., and that possession of said premises shall not change until the delivery of the Warranty Deed"; 3) that the vendees should obtain a policy of insurance on Key's life, payable to the vendors as security for payment of the vendees' obligation, and 4) that the vendees should insure the premises against loss by fire, etc., and deliver a copy of the policy of insurance to the vendors. Then follows the contract provision which is the basic subject of controversy in this case:

"It is understood and agreed by and between the parties hereto that time is of the essence of this contract and that in the event [the vendees] should become delinquent for as much as 30 days in the payment of any installment specified hereunder then [the vendors] are hereby [sic] relieved of the obligation of delivering [sic] of the Warranty Deed as herein contemplated and in such event all monies heretofore paid shall be construed [sic] as rent and [the vendees] shall have no further interest in and to said premises, other than as a tenant of [vendors]:

Provided, however, that in the event the payments are promptly made and the same are completed then the Warranty Deed heretofore mentioned shall be delivered to [the vendees] as evidence of the transfer of title."

At the outset, we should note that a) there is no question that the vendees defaulted; b) notwithstanding their default, the vendees have paid, not including taxes and insurance, $83,000 toward the purchase price; and c) that the balance due and owing on the contract at the time of trial, including interest, was $5,633.28.

To resume our brief narrative, it appears that Dr. Gregory and Dr. Key practiced together at their clinic for several years; the contract payments were regularly made and the transaction appears to have proceeded as the parties intended. Inferably, Dr. Gregory's health declined in 1971, at which time Dr. and Mrs. Key tendered the "total pay off" due on the note and asked that the warranty deed be executed. The vendors refused, because, in defendant Gregory's words, "it was not called for in the contract." The matter of prepayment was not further pursued. In December 1971 Dr. and Mrs. Key separated; Mrs. Key testified "my husband left." She moved to Joplin, obtained employment there as a nurse, and, as we understand her testimony, did not thereafter communicate directly with her husband.

Dr. Gregory died in December 1972. Dr. Key continued to operate the clinic, but at some time late in 1973 or early in 1974 began having difficulty complying with the obligations of the contract. We do not know the source of Dr. Key's troubles; his testimony suggests that he developed an ulcer, and was "practicing in and out due to ill health"; counsel for plaintiff attempted to suggest that Dr. Key's difficulties had a more sinister origin. In any event, Dr. Key

**2.** The two lots conveyed are the site of a medical office building variously referred to as the "clinic", the "Gregory Clinic" or the "Key Clinic." We shall refer to the property as the "clinic" as did the parties.

**3.** The note was apparently executed; it is referred to in correspondence between the parties dated August 26, 1971. (Plaintiff's Exhibit 6) The note was not produced at the trial.

did not pay the real property taxes on the clinic for 1973, which became delinquent January 1, 1974, and "had to let" the life and property insurance policies lapse at some time not detailed in the record. The last installment payment to Mrs. Gregory was made in February 1974.

The principal factual controversy on trial concerned the events of default. As noted, the record does not show when Dr. Key "had to" let the insurance policies lapse. Mrs. Gregory's evidence was that she "had nothing to do with" the life insurance policy required by the contract. In 1973 or 1974—we do not know when—Mrs. Gregory received a notice from an insurance agent that the clinic was no longer insured, and in May 1974 she paid the premium due. She became aware that the 1973 property taxes had not been paid when she received a notice from the Jasper County Collector's Office, in "June or July" of 1974. She testified, "There was no one at the clinic," when she received the notice of delinquency, and she paid the taxes July 3, 1974. She had the building repaired in March 1975. Mrs. Gregory's testimony was that she did not discuss the clinic with Dr. Key until after the default. As far as plaintiff was concerned, Mrs. Gregory said she "had no communication with Mrs. Key whatsoever," and made no attempt to contact her because Dr. Key "was the one that was using the Clinic and he was making the payments."

Dr. Key's recollection was that after it became apparent to him that he could no longer meet the terms of the contract he called his wife, advised her that he would no longer be able to pay her "alimony" and that she would have to take over the payments on the clinic. Plaintiff answered, "Go to hell," and hung up. The defendant produced a witness, a Mrs. Lawrence, who testified she overheard this telephone conversation, but the plaintiff categorically denied ever having such a conversation with her husband. It is to be borne in mind that Dr. Key and his wife had separated in 1971, but for whatever reason, their marriage was not dissolved until October 9, 1974. In any event, Dr. Key "closed" the clinic in April 1974. He and Mrs. Gregory "agreed" that he should have and retain the furniture and fixtures remaining in the clinic, according to Mrs. Gregory, as consideration "for the down payment." Dr. Key stored the furnishings at Carterville, surrendered the original copy of the contract to Mrs. Gregory, and entered a hospital.

The default was declared on April 2, 1974, when defendant Gregory, as an individual and as executrix of Dr. Gregory's estate, directed a letter to Dr. Key and the plaintiff, which read:

"Notice is hereby given that you are in default in the Contract for Deed covering the above property. The payment which was due on March 1, 1974, was not received by midnight, April 1, 1974, and I hereby elect to terminate your rights under said contract. Demand is hereby made for you to quit, surrender and relinquish possession of the premises and property known as the Key Clinic . . on or before the 1st day of June, 1974."

On April 25, 1974, plaintiff, by her attorney, advised Mrs. Gregory's attorney that the letter of April 2 was the first knowledge she had of the default. Mrs. Gregory was advised that plaintiff would either "catch up the payments or pay off the balance" due, whichever Mrs. Gregory considered preferable. By letter dated May 31, Mrs. Gregory advised the plaintiff she would insist on forfeiture.

Thereafter, this action was commenced. Plaintiff stated—and it is not disputed—that she offered to join her husband as a plaintiff, but he declined. Dr. Key was then made a party defendant, but the action against him was dismissed after he assigned his rights in the contract to the plaintiff on October 7, 1974. After trial, but before the entry of judgment, it was stipulated that the defendant had a) paid the sum of $802.04 in real property taxes for the years 1973 and 1974; b) that defendant paid a property insurance premium in the amount of $422.02; c) that defendant paid out the sum of $3,497 for repairs on the clinic, and d) that the balance due on

the contract as of October 1, 1975, including interest, was $5,633.28. On October 7, 1975, the court filed a memorandum opinion, and entered judgment ordering: 1) that defendant convey the realty described in the contract to plaintiff within 30 days and 2) that plaintiff contemporaneously pay defendant the balance due on the contract plus the amount advanced by defendant for taxes, insurance and repairs.

■ Considering the record as a whole, we have the tentative view that the trial court's decree is fully supported by the controlling precedents. In this case the amount which the surviving vendor would realize as damages is grossly disproportionate to her actual loss, and the general principles laid down in *Plymouth Securities Co. v. Johnson*, 335 S.W.2d 142, 152[7–9] [10] (Mo.1960), would appear to justify setting aside the forfeiture and ordering specific performance upon condition that plaintiff reimburse defendant in the amount of her actual damage. And, while we realize that specific performance should not be decreed on behalf of a vendee unless the vendee is able and willing to perform, *Domyan v. Dornin*, 356 S.W.2d 70, 72[4] (Mo.1962), we think the contract duty owed by the vendors ran jointly to both vendees and in the circumstances we believe the surviving vendor had a duty to notify the plaintiff directly of her intention to declare a forfeiture. *Tinnon v. Tanksley*, 408 S.W.2d 98, 104[10] (Mo.1966). There is evidence justifying the conclusion that plaintiff knew nothing of the default until she was notified by letter dated April 2, 1974, and that she then tendered full performance. Perhaps Dr. Key's dealing with the defendant, had he been the sole vendee, would have amounted to a rescission of the contract, but he was not authorized to abandon the plaintiff's rights without her consent, *Gage v. Gage*, 515 S.W.2d 793, 795[1] (Mo.App.1974), and there is no showing that plaintiff assented to or even knew of defendant's dealing with her husband. In fact, the contrary is clearly established.

We decline to go further however, and would have it clearly understood that our tentative conclusions are stated ex gratia in recognition of the fact that our duty to review the record runs basically to the litigants rather than to their counsel. Although there is certainly no dearth of easily available literature dealing with specific enforcement of installment land contracts,[4] defendant's counsel has contented himself with the presentation of three abstractions in his brief. They are: "1. The trial court erred in refusing to give effect to a 'time is of the essence' clause when there were no unusual facts to take this case out from under the general rule. 2. The court erred in granting specific performance to one who breached the contract and did not tender performance. 3. The court erred in not upholding a liquidated damages clause providing that past payments could be kept as rent and that such a clause did not represent a penalty or forfeiture." Counsel has cited 11 Missouri cases decided between 1869 and 1963; he has quoted the language of a good many of these decisions, but he has made no effort whatever to show why the cases he cites should be controlling, nor to demonstrate in what manner he conceives the trial court misapplied the principles stated in the cases he cites. The net effect of the brief is to request that we search the record for error prejudicial to the defendant.

■ We will once again state that despite the broad language of Rule 73.01, para. 3(a), V.A.M.R., we do not, in bench-tried cases, review the whole case on our own initiative to determine what result we would have reached if we were sitting as trial judges, nor will we voluntarily search the record for error. The term "de novo", if it ever was appropriate, no longer describes our review of bench-tried cases. *Murphy v. Carron*, 536 S.W.2d 30, 32[1–3] (Mo. banc 1976); *Schlanger v. Simon*, 339 S.W.2d 825, 828[1–3] (Mo.1960); *Pfoten-*

---

4. See, e. g., Note, 43 U.M.K.C.L.Rev. 199 (1974); Note, 29 Mo.L.Rev. 222 (1964); Comment, Installment Contracts for the Sale of Land in Missouri, 24 Mo.L.Rev. 240, 246–257 (1959); Annot., 55 A.L.R.3d 10 (1974).

*hauer v. Ridgway*, 307 Mo. 529, 532–533, 271 S.W. 50, 51[1][2][3, 4] (1925).

Further, we will reiterate that voluntary findings of fact such as those made in this case are not reviewable and present no question for review other than as a general finding, *Conley v. Crown Coach Co.*, 348 Mo. 1243, 1251, 159 S.W.2d 281, 285[8] (1942), and a defendant may not on appeal assign as error a specific finding of fact or conclusion of law, or the lack thereof, when such findings were not made at the request of one of the parties. *Swetnam v. U.S. By-Products Corp.*, 510 S.W.2d 829, 830[1] (Mo.App.1974). We have, as we believe our statement of the facts and ex gratia holding show, carefully reviewed the record. We decline to go further. The judgment is affirmed.

All concur.